Paul TERRILL and Gracie
Terrill, Appellants,

v.

Ruth TUCKNESS, Dorothy Epperson,
and Jo Nell Epperson Pool,
Appellees.

No. 04–97–00877–CV.

Court of Appeals of Texas,
San Antonio.

Sept. 23, 1998.

Paul M. Terrill, III, Hazen & Terrill, P.C., Austin, Scott Roberts, San Antonio, for Appellant.

Patrick M. Dooley, Dooley & Hoerster, L.L.P., Fredericksburg, Geoffrey D. Weisbart, Cynthia Olson Bourland, Hance Scarborough Wright, Austin, for Appellee.

Before HARDBERGER, C.J., and RICKHOFF and ANGELINI, JJ.

## OPINION ON APPELLANTS' MOTION FOR REHEARING

HARDBERGER, Chief Justice.

This court's opinion of July 22, 1998, is withdrawn and the following opinion and judgment are issued in its place. In our original opinion, we reversed and rendered judgment in favor of appellants, Paul and Gracie Terrill, in their trespass to try title suit. Upon consideration of the Terrills' motion for rehearing in this case, we amend or opinion and judgment to remand the cause

for a determination of whether attorneys fees and damages should be awarded and, if so, in what amount.

## NATURE OF THE CASE

In this appeal from a suit to try title, we determine the ownership of a narrow strip of land along Crabapple Creek in Gillespie County. Our determination involves two issues: the construction of the deeds purporting to pass title to the land, and whether record title, if established, has been interrupted by adverse possession. Appellants, the Terrills, argue that their chain of title unambiguously transfers ownership of the creek bank to them and that appellees, the Tuckness defendants, have not proven that they adversely possessed the land. Because we agree with the Terrills on both points, we reverse the judgment below and render judgment for the Terrills.

## FACTS AND PROCEDURAL HISTORY

The disputed 2.2 acres, along with the surrounding land, was part of a large land grant from the State of Texas to Samuel Maverick in 1872. Crabapple Creek ran through the middle of this grant until 1881, when Mary Maverick, Samuel's wife, began dividing and selling the original grant. Two relevant chains of title emerge from these divisions: that leading to the Terrills' deed and that leading to the Tuckness defendants' deeds. The relevant tracts, until 1941, were unambiguously separated by the creek. The deeds called for possession to "the middle of the creek." At some point, a fence was erected to the east of and parallel to the creek, up on a high bank. The land west of this fence and to the middle of the creek bed is the subject of this suit.

From approximately 1911 until 1979, the landowners in both chains of title were related. From 1911 to 1943, the Tuckness defendants' predecessor in title was William Hohmann, who owned from the center of the creek to the west; William's brother, Theodore Hohmann, owned from the center of the creek to the east until 1941. In 1943, William conveyed the land to his son, Henry. In 1941, Theodore's, wife, Emma, transferred the property to her daughter, Ella Moehle,

and Ella's husband David. Thus, the two tracts were owned by relatives in 1943: Ella Moehle and Henry Hohmann were cousins.

For reasons not reflected in the record and perhaps unknown, the 1941 deed from Emma Hohmann to Ella Moehle did not call to the middle of Crabapple creek, as prior deeds in the chain of title had. Instead, the deed called to the eastern bank of the creek and then north to a fence corner. That this change caused some confusion about record title to the tract is clear in the 1979 conveyance from Ella Moehle to Sam Douglass. Moehle ordered a survey of the property, requesting that the land "under fence" and the 2.2 acres of rocky creek bank, on the other side of the fence, be surveyed separately. The deed to Douglass reflected at least one change as a result of that survey. Because the new survey revealed a discrepancy between what Emma and Theodore Hohmann had taken by deed, 867 acres, and what they actually possessed, 893.5 acres, the new deed reflected the larger number. The deed also contained the call to the creek bank and then to a fence corner. In addition, while Moehle transferred the 893.5 acres to Douglass by warranty deed, she transferred the 2.2 acres by quitclaim.

In 1982, the Terrills purchased their property Sam Douglass. Douglass conveyed 893.5 acres to them by a warranty deed and, as Ella Moehle had done, quitclaimed the contested 2.2 acres. According to testimony of Paul Terrill, the couple used the property next to the creek periodically for recreational purposes: they hiked there, took their kids and grandchildren swimming there, and shot off fire works on the Fourth of July. The fence just above the creek had no gate for access to the water. Terrill testified that until 1986, he and his family walked over a log that was set up on the fence.

In 1986, Terrill put a gate in the fence. He testified that his grandchildren were old enough to require a substantial amount of water "equipment" when going to swim, and the gate became necessary in order to get everything down to the water. When Wilford Tuckness, Ruth Tuckness's husband, found the gate, he immediately boarded it up and erected a No Trespassing sign. Terrill

tried to contact the Tucknesses to work the problem out, but the Tucknesses refused to talk. Terrill then sued to establish his title to the 2.2 acres, relying on the deeds in his and the Tuckness defendants' chains of title.

Although the defendants did not plead ambiguity, the trial court raised the issue early in the trial and eventually found that, viewed together and as applied to the ground, the 1941 deed in the Terrill chain of title and the 1943 deed in the Tuckness defendants chain of title revealed a latent ambiguity. Therefore, extrinsic evidence was allowed on these conveyances, and the jury was asked to determine whether the 1941 deed conveyed the 2.2 acres and whether the 1943 deed conveyed them. The jury was also given questions on each of Texas's adverse possession statutes. The jury answered all questions in favor of the Tuckness defendants.

The Terrills raise several points of error. Disposition of three of those points will resolve the case: whether the trial court erred in submitting the question of deed interpretation to the jury; whether the 1941 deed unambiguously conveyed title to the 2.2 acres, and whether the Tuckness defendants have gained title of the property through adverse possession.

### DEED CONSTRUCTION AND AMBIGUITY

■ The construction to be given a deed is ordinarily a question of law. When a deed is intended as a complete memorial of a legal transaction, parol evidence is inadmissible to show prior or contemporaneous agreements relating to that transaction or to explain or vary the terms of the deed. *Massey v. Massey*, 807 S.W.2d 391, 405 (Tex.App.—Houston [1st Dist.] 1991), *writ denied*, 867 S.W.2d 766 (Tex.1993). However, if the intent of the parties as expressed on the face of the document is doubtful, a court may resort to parol evidence to resolve the doubt. *Id.*

■ Whether a deed is ambiguous is a question of law and is determined by "looking at the contract as a whole in light of the circumstances existing at the time the contract was entered into." Extraneous evidence is not to be considered in determining whether a contract is ambiguous, although

latent ambiguity may be found when the land description in the deed is applied to the ground. *Forest Park Properties of Arlington, Inc. v. Padgett*, 323 S.W.2d 320, 322 (Tex.Civ.App.—Fort Worth 1959, writ ref'd n.r.e.).

### *Pleading Ambiguity*

■ According to the Terrills, ambiguity is an affirmative defense that must be supported by pleadings. *See* TEX.R. CIV. P. 94. The Terrills objected to the admission of parol evidence, and they later objected to the questions asking the jury to engage in deed construction, on the grounds that, under Rule 94, the defendants had failed to plead ambiguity.

Under contract law, ambiguity must be pleaded. *See Modern Exploration, Inc. v. Maddison*, 708 S.W.2d 872, 876 (Tex.App.—Corpus Christi 1986, no writ). Ordinarily, rules of contract construction apply to deed construction. *See Boland v. Natural Gas Pipeline Co. of Am.*, 816 S.W.2d 843, 844 (Tex.App.—Fort Worth 1991, no writ); *Richard Gill Co. v. Jackson's Landing Owners' Ass'n*, 758 S.W.2d 921, 925 (Tex.App.—Corpus Christi 1988, writ denied).

The Tuckness defendants argue that the law is different in trespass-to-try-title suits, where introduction of the deed introduces all issues relevant to deed construction. There, the Tuckness defendants claim, ambiguity need not be pleaded. Although they cite none, there is case law supporting this position. *See Jacobs v. Chandler*, 248 S.W.2d 825, 831 (Tex.Civ.App.—Amarillo 1952, no writ) (in trespass to try title suit, there is no need to plead ambiguity to support jury question on grantor's intent); *Wyman v. Harris*, 222 S.W.2d 297, 308 (Tex.Civ.App.—Beaumont 1949) (no pleading required for equitable relief, such as reformation, on basis of ambiguous deed).

However, there is also case law suggesting that pleading ambiguity of a deed is necessary. *See Rutherford v. Randal*, 593 S.W.2d 949, 952 n. 1 (Tex.1980) (holding that ambiguity must be pleaded *unless* the ambiguity is apparent on the face of the deed); *Gibson v. Watson*, 315 S.W.2d 48, 53 (Tex.Civ.App.—Texarkana 1958, writ ref'd n.r.e.) (where par-

ties did not plead ambiguity, look to four corners to construe deed); *Baldwin v. Willis,* 253 S.W.2d 287, 293 (Tex.Civ.App.—Beaumont 1952, writ ref'd n.r.e.) (no pleading required where deed contained specific description from which a determination could be made of meaning of deed, but pleadings required where reformation was requested based on latent ambiguity or mutual mistake); *see also Robbins v. HNG Oil Co.,* 878 S.W.2d 351, 354 (Tex.App.—Beaumont 1994, writ dism'd w.o.j.) (where ambiguity was not pleaded, deed construction became question of law for the trial court); *Lower Colorado River Auth. v. Naumann,* 638 S.W.2d 195, 198 (Tex.App.—Houston [1st Dist.] 1982, writ ref'd n.r.e) (where parties did not plead or submit evidence of deed ambiguity, court looked to four corners of deed).

We believe the correct position is that latent deed ambiguity in a deed must be pleaded. If a jury is allowed to answer questions on deed construction without pleadings of ambiguity, the judgment of the court cannot comport with the pleadings. *See* TEX.R. CIV. P. 301. In addition, a plaintiff in a suit to try title is entitled to notice that he will be required to prove that his deed is unambiguous, or, if he loses on that issue, that he may have to call witnesses to show the facts and circumstances surrounding the execution of that deed.

That the trial court itself, rather than the Tuckness defendants, raised the issue of ambiguity does not change the result. This court considered a remarkably similar procedural problem in a contract case, *Crozier v. Horne Children Maintenance and Educational Trust,* 597 S.W.2d 418 (Tex.Civ.App.—San Antonio 1980, writ ref'd n.r.e.). In *Crozier,* the defendant's attorney, during direct examination, attempted to introduce evidence extrinsic to the four corners of the contract at issue. The plaintiff's attorney objected to the admission of parol evidence. The trial court then, sua sponte, raised the issue of ambiguity and allowed extrinsic evidence on the meaning of the contract. *Crozier,* 597 S.W.2d at 423–24.

This court held that the trial court erred in several respects, including issuing a judgment that was not based on the pleadings.

*Id.* at 424. The court remanded the case rather than rendering judgment only because it found that the trial judge had also erred by not allowing the defendant to amend its pleadings when it requested permission to do so, so that it could include ambiguity as a defense. *Id.*

Following the Crozier analysis, we find it was error to allow the jury to construe the deeds in the absence of pleadings on ambiguity. We also find that submission to the jury was erroneous because the deeds are unambiguous as a matter of law and pass ownership of the 2.2 acres through the Terrills' chain of title.

### *Grounds for Ambiguity*

■ One scholar has described the process of deed interpretation as three tiered: (1) the trial court attempts to ascertain the grantor's intent by examining the plain language of the deed; (2) the court then applies applicable rules of construction to the deed; (3) the court then allows extrinsic evidence in to aid in interpretation. Laura Burney, *The Regrettable Rebirth of the Two–Grant· Doctrine in Texas Deed Construction,* 34 S. TEX. L.REV. 73, 78 n.33 (1993). A court is not required to follow all three steps; subsequent steps are taken only if intent remains unclear. *Id.* An instrument is ambiguous *only* when the application of the rules of construction leaves it unclear which meaning is the correct one. *Prairie Prod. Co. v. Schlachter,* 786 S.W.2d 409, 413 (Tex.App.—Texarkana 1990, writ denied). Where parties merely disagree about the interpretation of a deed, a deed is not ambiguous, and the court must apply rules of construction to determine its legal meaning. *Hart v. United States,* 945 F.Supp. 1009, 1012 (E.D.Tex. 1996); *GTE Mobilnet v. Telecell,* 955 S.W.2d 286, 289 (Tex.App.—Houston [1st Dist.] 1997, writ denied).

The trial court and the Tuckness defendants give several grounds for finding the deeds ambiguous: (1) the 1941 deed from Emma Hohmann to Ella Moehle contains an "impossible" call; (2) the 1941 deed is "missing" a call contained in the 1943 deed; (3) language in the 1943 deed suggests William Hohmann conveyed the 2.2 acres in his chain

of title; (4) language in the 1941 deed suggests Emma Hohmann meant for fences, rather than the creek, to establish the true boundary of her property; and (5) the 1941 deed contains a call from the bank to a fence corner. It was error to allow the jury to interpret the deeds on these grounds. The facts are really not in dispute here; there was nothing for a jury to resolve. There are simply two competing arguments about the deeds' meaning. *See Telecell,* 955 S.W.2d at 289. Relevant rules of construction can be applied to determine the legal meaning of the deeds at issue, and thus interpretation remains a question of law. *See Hart,* 945 F.Supp. at 1013.

### The "Impossible" Call

■ The Tuckness defendants' expert, Charles Ottmers, testified that an "impossible" 388 varas call rendered the 1941 deed ambiguous as applied to the ground.[1] The call in question begins at a fence corner and from there:

> THENCE West 388 varas to the East bank of Crabapple creek; THENCE down said creek with the meanders of its East bank....

According to Ottmers, the 388 varas actually takes the surveyor across the creek and onto its west bank, and therefore the call is ambiguous. We disagree.

A surveyor is to prefer calls to natural monuments over metes and bounds or course and distance calls. *Howland v. Hough,* 570 S.W.2d 876, 882 (Tex.1978). Therefore, according to the testimony of both the Terrills' and the Tuckness defendants' experts, a surveyor attempting to retrace the steps taken for the 1941 measurements should *stop at the bank of the creek. See Pierce v. Alexander,* 189 S.W.2d 16, 17 (Tex.Civ.App.—Texarkana 1945, no writ). In *Pierce,* the court interpreted a call for the east line of a piece of property to be 385 varas to Wallace Creek. Pierce, 189 S.W.2d at 17. The court held that no ambiguity was created when the deeds were applied to the ground even though the 385 vara call fell short of the next

line called for because "the call is for Wallace Creek and in law it must be extended to said creek." *Id.; see also Richardson v. Pavell,* 83 Tex. 588, 19 S.W. 262, 263 (1892) (preferring call to natural monument over courses and distances).

According to Ottmers, who surveyed the property in 1979 for Ella Moehle, if the call in question were *288 varas,* rather than 388, it would *almost* match up with the next call, which is to the fence corner. The problem with this testimony is that it substitutes one ambiguity for another, while pulling a number that happens to work for the defendants from the air. That Ottmers was seeking a way to make the call reconcile to a fence corner is understandable: Ella Moehle commissioned Ottmers to survey the property under fence separately. He was attempting to reconcile fence corners. On the other hand, under the Terrills' claim, following the language of the 1941 deed, the surveyor would start walking from the fence corner and stop at the bank of the creek, as the rules of construction require. Ottmers couldn't do this because he was attempting to survey the land *under fence,* as he was directed to do. In fact, he testified that the 1941 deed unambiguously establishes the creek as the eastern boundary of the Moehle piece of property.

The trial judge himself acknowledged that, if the 388–vara call were the only problem with the deeds, there probably would not be an ambiguity. Because we believe the call to the creek must take precedence over the course and distance call, we find no ambiguity in the 388–vara call.

### The Missing 26.6 Varas Call

■ The 1943 deed from William to Henry Hohmann contains, as part of the calls following the meanderings of the creek, a 26.6–varas call that is not contained in the 1941 deed in the Terrill's chain. The Tuckness defendants claim that because this call is missing from the 1941 deed, an ambiguity is created in that deed. However, one instrument may not be used to create an ambi-

---

1. The same 388 varas call is present in the 1943 deeds in the defendants' chain of title; however, they do not mention this. There is no evidence to support the Tuckness defendants' claim that this 388 figure was the result of a scrivener's error.

guity in or to explain another deed unless (1) the instruments are between the same parties; or (2) the instruments are between other parties, and the party wishing to rely on the extrinsic instrument can show that the parties had knowledge of the instrument. *Bartel v. Pick,* 643 S.W.2d 224, 226 (Tex. App.—Forth Worth 1982), *aff'd* 659 S.W.2d 636 (Tex.1983). All the deeds introduced by the Terrills are relevant to their suit. *See Rogers v. Ricane Enterprises, Inc.,* 884 S.W.2d 763, 768 (Tex.1994) (to recover in trespass-to-try title suit, plaintiff must show (1) a regular chain of conveyances from the sovereign; (2) a superior title out of a common source; or (3) prior possession that has not been abandoned). However, this does not mean that one deed may be used to create confusion in another, absent some showing that the two are connected.

Further, although both experts at trial acknowledged the missing call, neither could explain its significance. The Tuckness defendants ask this court to "insert" the missing 26.6 vara call to "match up" the two deeds, but they don't explain exactly what that would accomplish. We cannot assume, to suit the Tuckness defendants' purposes, that the 26.6 varas is properly in their chain of title and erroneously missing from the Terrills' chain, especially in the absence of any testimony about what the missing 26.6 varas means.

### *"Lands Under Fence...."*

■ The Tuckness defendants claim that particular language in their 1943 deed creates an ambiguity in the 1941 deed. After a description of the property at issue, a parenthetical statement is added: "It being intended to hereby convey all of the lands under fence which embrace the farming and ranching lands *owned by* William V. Hohmann and wife, Janie Hohmann at the time of the death of Wm. V. Hohmann, Dec. and which are known as the 'Wm. V. Hohmann Ranch' or 'Wm. V. Hohmann Ranch Property' (emphasis added)." Because the 2.2 acres is bounded on its eastern border by a fence, the Tuckness defendants claim this language makes it clear that the property is meant to be in their chain of title.

Again, the 1943 deed cannot be used to create ambiguity in the 1941 deed. *See Bartel,* 643 S.W.2d at 226. What the grantors and grantees conveyed or intended to convey in 1943 is of no relevance to the 1941 deed without proof that the 1941 conveyors knew of the 1943 deed (an impossibility) or that the 1943 conveyers knew of the 1941 deed.[2] There is no evidence of this.

However, even if we were to consider the 1943 deed, that document does not demonstrate an ambiguity in the 1941 deed. We agree with the Terrills that the language "owned by William V. Hohmann and his wife" limits the description. By its plain language, the deed cannot encompass more land than the couple owned, even if that land was "under fence." Since the deeds prior to 1941 in the Terrills' chain clearly include the 2.2 acres, it is difficult to see how William Hohmann could "own" the property so as to properly convey it, especially in the absence of evidence of a transfer to William Hohmann in between 1941 and 1943.

■ The 1943 deed contains a call to the northwest corner of the Moehle land and thence up the creek with the meanders of its East bank A call to the bank of a creek is a call to the middle of the creek and establishes the creek as the proper boundary, under Texas law. The calls here are not to fence corners, but to property corners. There is no ambiguity in the 1943 deed.

### The *"True Division Line"* Language

■ The Tuckness defendants argue that the following language in the 1941 deed in the Terrill's chain of title reflects an ambiguity: "[I]t is understood that the true division line between the lands herein conveyed to Grantee and the land to Grantee in deed or deeds by me made this date to *my other*

---

**2.** Further, even where ambiguity is found, extrinsic evidence is admissible only to show the intent of the grantor at the time the deed was executed. *Pak–Mor Co. v. Brown,* 364 S.W.2d 89, 93–94 (Tex.App.—San Antonio 1962, writ ref'd n.r.e.).

The 1943 deed could not be relevant to that purpose, because it did not involve the grantor of the 1941 deed and was executed two years after that deed.

*children,* insofar as their respective tracts adjoin, shall be and is the fence line now constructed between such adjoining tracts (emphasis added)."

However, we agree with the Terrills that the language has been misapplied. The first "grantee" mentioned in that sentence is Ella Moehle, Emma Hohmann's daughter, who took under this deed. The *next* grantees are Emma Hohmann's other children, to whom she obviously deeded portions of her husband's estate on the same day. These children *are not* the predecessors in title to the Tuckness defendants. Thus, this language says nothing at all about what is to serve as the boundary between the property conveyed to Ella Moehle and the property that was then owned by William Hohmann, her uncle.

In addition, as the Terrills point out, all the calls for the boundary lines between Moehle and Emma's other children do, in fact, call for fence corners. The call for the boundary between Moehle and the Tuckness predecessors in title is to the bank of the creek.

### The Call From the Creek to the Fence

 While this call most supports the trial court's finding of ambiguity, it too can be given legal meaning by application of rules of construction. The call in question is as follows:

> THENCE West 388 varas to the East bank of Crabapple Creek; THENCE down said creek with the meanders of its East bank ... *to a fence corner.*

There is no fence corner where one would hope to find one from this call: in the middle of or on the bank of the creek. Instead, the only fence corner available is the one up on the high bank, away from the creek. Taken literally, and without the application of rules of construction, the line called for would be a sharp diagonal from the middle of the creek on one end to the fence on the other.

 According to the Terrills, the call to the fence is to be ignored in favor of the call to the natural boundary. They rely heavily on case law holding that meander calls as a matter of law establish the river or creek shore as the boundary of property unless a contrary intention is clearly apparent from the deed. *See Strayhorn,* 300 S.W.2d at 632; *Moore,* 197 S.W.2d at 517–18. In *Moore,* this court noted that, because a surveyor cannot go into a stream in order to make a corner, he makes the corner on the bank of the stream. Thus, a call that goes "along a bank" actually sets the creek as the boundary. *Moore,* 197 S.W.2d at 517. *Moore* established an exception to the rule that, in interpreting the calls in a deed, one is to follow the footsteps of the surveyor. In *Moore,* the court stated that the exception exists for two sound policy reasons, in addition to the impracticality of setting stakes in middle of streams. First, it is unreasonable to assume that grantors would intend to reserve narrow strips of land between surveys. *Id.; see also Strayhorn,* 300 S.W.2d at 638 ("[I]t is presumed that a grantor has no intention of reserving a fee in a narrow strip of land adjoining the land conveyed when it ceases to be of use to him, unless such fee is clearly reserved"). Second, Texas favors a rule that would allow owners of properties abutting on both sides of a stream to have access to the waters of that stream. *Moore,* 197 S.W.2d at 518.[3] Thus, a deed will be construed to pass title to the bed of the stream "unless a contrary intent is clearly shown by the language of the instrument." *Id.; see also State v. Brazos River Harbor Nav. Dist.,* 831 S.W.2d 539, 542 (Tex.App.— Corpus Christi 1992, writ denied).

 We believe that the trial court erred in giving the issue of intent to the jury on this basis. Applying the rules of construction to this deed, we find that Emma Hohmann clearly intended to pass the 2.2 acres to her daughter in 1941. The Tucknesses' argument, on the other hand, necessitates going against several legal presumptions: the presumption that Emma Hohmann did not retain a narrow strip of property for herself, the presumption that the meander calls set the boundary as the creek rather

---

3. We note that the Tuckness defendants' property encompasses both sides of the creek everywhere the creek runs through the property except where the Terrill's property reaches out and abuts the creek. The 2.2 acres is the only natural water source on the Terrills' property.

than the corner established beyond the water itself; the presumption that a grantor conveys all she has to convey, *Large v. T. Mayfield, Inc.,* 646 S.W.2d 292, 294 (Tex.App.—Eastland 1983, writ ref'd n.r.e.); the presumption that favors grantees over grantors in construing deeds *Bailey v. Mullens,* 313 S.W.2d 99, 102 (Tex.Civ.App.—San Antonio 1958, writ ref'd n.r.e.); the presumption that any scrivener's errors are construed against the drafter, *Manzo v. Ford,* 731 S.W.2d 673, 676 (Tex.App.—Houston [14th Dist.] 1987, no writ). The property was clearly in the Terrills' chain of title until 1941, and, absent a conveyance to the Tuckness' predecessors in title, we are at a loss to explain why the Tucknesses believe the land was picked up by them in 1943. In addition, that Ella Moehle conveyed the property, albeit via quit claim, to Sam Douglass suggests that no one was intentionally giving it up in 1941. *See Caddell v. Lufkin Land & Lumber Co.,* 255 S.W. 397, 402 (Tex. Comm.App.—1923, judgm't adopted) (finding relevant, in construing deed, what subsequent deed conveyed).

Finally, Ottmer's testimony about why he surveyed the property the way he did persuades us that it was error to find the deed ambiguous:

> QUESTION: There's no question that the deeds on both sides of this creek are telling us that the dividing line is the east bank of the creek?
>
> ANSWER: That's correct.

* * * * * * * * * *

> QUESTION: Does the Moehle Deed (the 1941 deed) call for this boundary on their property to be the east bank of the creek?
>
> ANSWER: Yes, it does.
>
> QUESTION: And it doesn't call for any fence line to be the west boundary?
>
> ANSWER: It does not.
>
> QUESTION: Okay, and when you surveyed it, you didn't survey according to what the deed said. You surveyed down here to where the fence was and then went down the fence line, didn't you?

* * * * * * * * * *

> ANSWER: That's correct.

* * * * * * * * * *

> QUESTION: [W]hen you have a call in the deed and one—and one call it says to go to a fence corner on the bank of the creek, and there's not a fence corner on the bank of the creek, should you pay attention to the fence corner or to the bank of the creek?
>
> ANSWER: Well, in this case there was no decision for me to make, because I was asked to survey it the way I did. If I were doing it on my own, it would probably be— I would do it differently.

We fail to see how Ottmers' testimony about the 388 varas or the call to the fence corner can be evidence of ambiguity in the 1941 deed, when he was not following the 1941 deed when he conducted his survey.

The Tuckness defendants argue that the call from the creek to the fence corner is a clear ambiguity that cannot be ignored simply by resorting to the dignity of calls. They point out that if the 388 varas is changed to read 288 varas, and the "missing" 26.6 varas call is supplied, the surveyor arrives at a fence corner that is almost parallel to the fence post called for in the next call. They thus contend that the overwhelming weight of the evidence supports the inference that, even though the initial call is to a natural monument, it should fall in the face of a series of calls, in both deeds, to fence corners. We do not think it necessary to resort to such a tortuous construction to find the true meaning of the 1941 deed. We are persuaded that the 2.2 acres in question was Emma Hohmann's to convey in 1941, and we can think of no reason why she would not convey it to her daughter. Under the Tuckness's argument, Emma Hohmann simply retained title to the 2.2 acres rather than passing it to Ella Moehle. But the law presumes that she did convey it. *Strayhorn,* 300 S.W.2d at 638. Without clear evidence to the contrary, it is unreasonable to conclude that she retained it for herself and that it somehow ended up in the Tuckness defendants' chain of title. We will not make that leap.

## The 1943 Deed

■ The trial court's charge asked the jury to determine whether the 1943 deed from William Hohmann to Henry Hohmann conveyed the 2.2 acres. The jury found that it did. The Tuckness defendants did not plead that the 1943 deed was ambiguous. This is fatal to their claim. Further, the interpretation of that deed should not have been put to the jury, because the 1943 deed unambiguously did not transfer the property.

Ottmers testified, on cross examination, that the only suggestion in the 1943 deed that the Tuckness defendants' predecessors in title could claim any property on the east bank of the creek was the call in that deed to the "Moehle corner." However, the 1941 Moehle deed establishes the corner to be the east bank of the creek. Although Ottmers testified that the call was to a "fence corner" on the east bank, the 1943 deed does not say this. It says, "thence up Crabapple Creek with the meanders of its E. Bank ... to the S.W. corner of the Moehle land; *Thence,* E. 388 varas to a fence corner." The latter call to the fence corner takes the tract to its northeast corner, *not* to the fence built away from the east bank of the creek.

Further, we find that the deed is unambiguous and did not transfer the 2.2 acres.

### ADVERSE POSSESSION

Because we hold that the Terrill's chain of title unambiguously passed title to the 2.2 acres, we must resolve whether the Tuckness defendants have, as they claim, taken title by adverse possession.

The Tuckness defendants claim title to the 2.2 acres by adverse possession on the basis of four Texas statutes: the 3–year recorded deed statute, the 5–year recorded deed statute, the 25–year recorded deed statute, and the 10–year naked possession statute. The jury gave affirmative answers to each question. We find the evidence legally insufficient to support title under any of these statutes.

4. At any rate, the only deed the Tuckness defendants argue supports their claim to record title is

## The Three-, Five-, and 25–Year Statutes

■ Section 16.024 of the Civil Practice and Remedies Code provides that suit must be brought against a person who holds property in peaceable and adverse possession under title or color of title within three years. TEX. CIV. PRAC. & REM.CODE ANN. § 16.024 (Vernon 1996). Section 16.025 provides that suit must be brought within five years against a person who cultivates the property, pays taxes on the property, *and* claims the property under a duly registered deed. *Id.* at § 16.025. Section 16.028 provides that suit must be brought within 25 years against a person who holds the property in good faith and under a deed purporting to convey the property that is recorded in the deed records of the county where any part of the real property is located. *Id.* at § 16.028.

Because we find as a matter of law that the Tuckness defendants do not hold the property under title or color of title, they cannot claim adverse possession under these statutes.[4] Further, there is no evidence that the Tuckness defendants paid taxes on that land. *See id.* at § 16.025. The only evidence is that they paid taxes on their property. The County Tax Assessor testified that this would not include the 2.2 acres. On the other hand, the Terrills' deed clearly grants them, via quit claim, the disputed land, and they did pay taxes on it.

### The 10–Year Naked Possession Statute

■ To claim adverse possession under section 16.026 of the Texas Civil Practice and Remedies Code, the claimant must prove that he adversely possessed the claimed land for ten years. *Id.* at 16.026 Adverse possession is defined as "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." *Id.* Possession must be "actual, visible, continuous, notorious, distinct, hostile, and of such as character as to indicate unmistakably an assertion of a claim of exclusive ownership in the occupant."

the 1943 deed. This is not their deed.

*Rhodes v. Cahill,* 802 S.W.2d 643, 645 (Tex. 1990).

▌ The Terrills argue that, in Texas, where the adverse claimants are relying on mere grazing to show adverse use, they must prove that they "designedly enclosed" the tract at issue. *See Rhodes v. Cahill,* 802 S.W.2d at 645; *Orsborn v. Deep Rock Oil Corp.,* 153 Tex. 281, 267 S.W.2d 781 (1954). We agree. Jurors were given an instruction on designed enclosure, and they answered in the affirmative. However, the evidence is legally insufficient to support this answer.

▌ Although there is a fence up from the creek, there was no testimony about who built the fence or for what purpose. Where a fence exists before the claimant took possession of the land, and the claimant cannot demonstrate the purpose of the fence, then the fence is held to be a "casual fence." *McAllister v. Samuels,* 857 S.W.2d 768, 777 (Tex.App.—Houston [14th Dist.] 1993, no writ); *see McDonnold v. Weinacht,* 465 S.W.2d 136 (Tex.1971) (where purpose of fence could not be determined, it was held to be a casual fence rather than one constructed by adverse claimant to enclose the land, even though claimant maintained the fence).

▌ The Tuckness defendants argue that, because Gillespie County does not have open range laws, the designed enclosure rule should not apply here. The trial court took judicial notice of a 1933 law in that county that allowed voters to opt out of open range laws. Owners in Gillespie County have an affirmative duty to fence their property to enclose their cattle. The Tuckness defendants argue that the *Osborn* line of cases only makes sense where ranchers' cattle were allowed to run free; a fence was required to demonstrate the claimant's intent to claim property rather than his mere reliance on open range laws. *See McDonnold,* 465 S.W.2d at 146 ("in a society where unenclosed land is considered open range and commons for the livestock for others, the mere presence of these animals will not be considered as adverse to the ownership of the land").

The Terrills ask the court to take judicial notice that, in several of the cases requiring proof of a designed enclosure, the counties involved also had special range laws rather than open range laws. *See Rhodes,* 802 S.W.2d at 645–46 (law in effect since 1936); *Georgetown Builders v. Heirs of Tanksley,* 498 S.W.2d 222 (Tex.Civ.App.—Austin 1973, writ ref'd n.r.e.) (law in effect since 1936); *Dellana v. Walker,* 866 S.W.2d 355 (Tex. App.—Austin 1993, writ denied) (law in effect since 1936). In addition, the Terrills note that, by the Tuckness defendants' admission, the fence was in place since *before* 1930; the stock law went into effect in 1930.

This court has upheld the designed enclosure principle in the past ten years, with no discussion of open range laws. *See Butler v. De La Cruz,* 812 S.W.2d 422 (Tex.App.—San Antonio 1991, writ denied). The principle is sensible and firmly rooted in Texas jurisprudence, and we will not accept the Tuckness defendant's invitation to create a new exception to it.

▌ The Tuckness defendants argue that, even if designed enclosure is to be applied here, they fall within an exception to the rule because they have shown more than mere grazing in order to claim the land by adverse possession. *See Fish v. Bannister,* 759 S.W.2d 714, 718 (Tex.App.—San Antonio 1988, no writ). They argue that their deeds as well as a jeep trail on their side of the creek show other claims to the property. In addition, there is some testimony that they leased all their property, including the 2.2 acres to hunters. In *Fish,* we held, "[A]ctive and total use of the pasture grazing capacity *to the exclusion* of all others, with the claimant's livestock *continuously* present and visible evidences the required notice of the hostile claim," making evidence of a designed enclosure unnecessary. *Fish,* 759 S.W.2d at 718. However, the Tuckness defendants have not shown sufficient non-grazing use to make use of the exception.

An example of how the exception is applied is seen in *Butler,* where this court upheld a jury finding of adverse possession where, in addition to open grazing, the adverse claimants proved that they had built fences on two sides of the disputed property, maintained a third fence, erected corrals, pens, and built a

small shack. *Butler,* 812 S.W.2d at 424–25. There was evidence that the adverse claimants planted crops on the tract in dispute. *Id.* at 425. In addition, when the appellees asked the adverse claimants for permission to hunt on the tract, they were refused and "chased off." *Id.* The appellees were paid by the adverse claimants to clear part of the land. *Id.* Nothing even remotely similar has taken place here. The evidence is legally insufficient to allow the Tuckness defendants to claim an exception to that principle. The adverse possession claim under the 10–year naked possession statute fails.

Moreover, even if the designed enclosure principle does not apply here, the Tuckness claimants ·simply haven't proven that their possession was hostile with legally sufficient evidence.

 Hostile possession means that the possession of the land was hostile to the record owner. *Porter v. Wilson,* 389 S.W.2d 650, 658 (Tex.1965). Hostile possession must be continuous and consistent for the duration of the statutory period. *Balli v. McManus,* 311 S.W.2d 933, 936–37 (Tex.Civ.App.—San Antonio 1958, writ ref'd n.r.e.). The test for hostility is whether the acts performed by the claimant on the land and the use made of the land were of such a nature and character as to reasonably notify the true owner of the land that a hostile claim was being asserted to the property. *Winchester v. Porretto,* 432 S.W.2d 170, 174–75 (Tex.Civ.App.—Houston [1st Dist.] 1968, writ ref'd n.r.e.). Whether possession is hostile and continuous are questions of fact.

 Hostile possession during the Terrills' ownership was not proven. The Tucknesses claim they let their cattle roam the 2.2 acres; the Terrills claim they let their grandchildren swim in the creek. Both parties presented evidence that the other side was aware of their presence.[5] No one seemed to care very much until the Terrills put the gate in. The response at that point was swift. However, there is simply *no* evidence that the Tuckness defendants possessed the land in a manner that was hostile to the Terrills or to their predecessors in title. True, there was no gate in that portion of the fence, but since we cannot say who built the fence in the first place, that hardly constitutes evidence for either side.[6]

In *Georgetown Builders, Inc.,* the Austin court of appeals reversed a jury verdict in favor of the adverse claimants. In that case, the appellant had taken a narrow strip of property next to a waterway by quitclaim deed, just as the Terrills did here. The appellees allowed their sheep to graze on that strip, and the predecessors in title to the appellant had never complained. There was a fence, situated very similarly to the fence in this case. The adverse claimants didn't know who built the fence, but they maintained it. Their livestock were free to run to the fence. They did not pay taxes on the strip, nor did they maintain "notorious" possession. Partly relying on the designed enclosure doctrine and partly relying on the facts of the case, the court held that the adverse claimants simply had not shown adverse and hostile possession sufficient to perfect title. The analogy to this case is obvious.

 Nor did the evidence established adverse possession in any of the Tucknesses' predecessors in title. There is much evidence that the predecessors believed the property was theirs and used the property to run cattle. However, there is no evidence that they purposely enclosed the land for that purpose, and there is only one piece of evidence that arguably supports that the use was hostile and exclusive. Wilford Tuckness testified that his predecessor in title chased a hunter off the 2.2 acres and that the hunter had leased from the Moehles. According to

---

5. Wilford Tuckness testified that he had no knowledge of anyone trying to use the 2.2 acres prior to 1982, when the Terrills purchased the land. A reasonable inference is that he was aware of the Terrills' use.

6. The Terrills argue that the fence most likely was built by the Terrill predecessors and was built high up from the bank of the creek to avoid being washed out by floods. Their expert testified that such placement of fences in the area was common. *See Georgetown,* 498 S.W.2d 222 (Tex.Civ.App.—Austin 1973, writ ref'd n.r.e.), where such a fence is at issue.

Tuckness's testimony, his predecessor told David Moehle that he had chased the hunter off, David Moehle had acquiesced to that action. This testimony was hearsay and erroneously admitted. *See Butler*, 812 S.W.2d at 425 (statements of deceased, who was in privity of title with appellees, were hearsay and did not fall within exception allowing statements against interest to be admitted, especially in absence of guaranty of trustworthiness); *Green v. Blanks*, 342 S.W.2d 141, 148 (Tex.Civ.App.—Austin 1960) (son could not testify as to what his father, deceased, said about use of property, because testimony was hearsay); *Boettcher v. Gould*, 577 S.W.2d 806, 808 (Tex.Civ.App.—1979) (witness could not testify that reliable informants had told him who built the fence). Moreover, the hearsay statement, even if allowed, did not sufficiently identify the property to establish an adverse claim, and the evidence does not prove continuous, hostile possession.

▮ The most this record shows is that owners on the Tuckness defendants' side of the creek ran cattle down to creek for decades with no objection from the owners on the Terrills' side of the creek. *See Rick v. Grubbs*, 147 Tex. 267, 214 S.W.2d 925 (1948) (adverse possession cannot exist as a matter of law where possession is shared). There is some evidence that the Terrills' predecessors in title knew about and tolerated this use, but no evidence that they acted in such a way as to waive their record ownership. Adverse possession isn't about who uses the property *more* or for better purposes; it's about whether one party ousts another from his legally held land. In other words, exclusive possession is required. *Kleckner v. McClure*, 524 S.W.2d 608, 613 (Tex.Civ.App.—Ft. Worth 1975, no writ). The owner must be wholly excluded by the adverse claimant. *Id.* at 612–13. Such exclusion did not happen here. Emma Hohmann conveyed the property in 1941, Ella Moehle conveyed it in 1979, and Sam Douglass conveyed it in 1982.

### Tacking

▮ The jury was given the following instruction on tacking successive periods of adverse possession:

Successive periods of adverse possession by those in privity can be tacked or added together in order to satisfy the entire statutory limitations period; in such circumstances, limitation title ripens into and becomes vested in the adverse possessor who had possession at time the statutory limitation period expired.

This instruction allowed the jury to trace continuous and hostile use from one period of ownership to the next period in order to satisfy the relevant statute of limitations. *See* TEX. CIV. PRAC. & REM.CODE § 16.023 (Vernon 1986). However, if, as the Tuckness defendants claim, adverse possession to the 2.2 acres matured prior to the Terrill's possession, then the Tuckness predecessors in title were required to pass ownership by deed. *See Haby v. Howard*, 757 S.W.2d 34, 38 (Tex.App.—San Antonio 1988, writ denied); *H.L. Brown & Assoc., Inc. v. McMahon*, 525 S.W.2d 553, 558 (Tex.Civ.App.—Tyler 1975, no writ).

Because the property was jointly used, adverse possession could not have ripened during any time that the Terrills owned the adjoining tract. There is no evidence of Sam Douglass's use of the property and no evidence that the Tuckness defendants sought to keep Douglass off the 2.2 acres. Thus, adverse possession has not been proven from 1979 to 1982. If adverse possession ripened during the time the ownership of Henry or William Hohmann, (the Tuckness defendants, in their brief, state that title by limitation matured prior to "Mr. Terrill even knowing of the property"), under the case law, the Henry Hohmann family was required to pass title, through written conveyance.

The 1987 partition deed, under which Ruth Tuckness took, calls to the bank of the creek and then directs the surveyor to follow its meanders. Thus, the deed does not transfer the 2.2 acres.

### BONA FIDE PURCHASER FOR VALUE

Jury question 7 asked the jury whether the Terrills had paid consideration for the 2.2 acres. The jury was instructed that a bona fide purchaser was a person "who purchases in good faith for valuable consideration without actual or constructive notice of a claim of

another." The jury answered in the negative.

The Terrills complain that the issue was not pleaded and is irrelevant and erroneous. The Tuckness defendants respond that the question was relevant because "one claiming title must rely upon the title and cannot claim a greater title than one has." Thus, if the Terrills were on notice of the Tuckness's claim, then their title cannot defeat a limitation title or a record title in the Tuckness defendants. Because we find that the Tucknesses have not taken by limitation or by record, the issue is irrelevant.

### CONCLUSION

The ambiguity defense that allowed the deeds to go the jury for interpretation fails in the absence of pleadings. However, even if pleadings were not required, we find that application of relevant rules of deed construction enables the deeds to be construed as a matter of law. We further find that the 1941 deed in the Terrills' chain of title unambiguously conveyed title to the 2.2 acres, and the 1943 deed in the Tuckness defendants chain of title unambiguously did not convey the tract.

The designed enclosure rule defeats the adverse possession claim. However, even if that rule were not to be applied, the Tuckness defendants have not provided legally sufficient evidence of hostile possession and they have not proven that, if title by adverse possession was attained during William or Henry Hohmann's ownership, the property was subsequently conveyed to them by deed.

At trial, the Terrills presented evidence of damages caused by the Tuckness defendants excluding them from their property. In addition, the Terrills presented evidence of their reasonable attorneys' fees in pursuing this case. Attorneys fees may, at the trial court's discretion, be awarded in suits for the possession of real property claiming under record title. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.034 (Vernon 1986). Because neither the jury verdict nor the judgment favored the Tuckness defendants, damages and fees were not reached. We therefore remand this case for a determination of what amount, if any, should be awarded.