

In The

Court of Appeals

Seventh District of Texas at Amarillo

_____

No. 07-12-00378-CV
_____

LEVADA M. WELLS, TRUSTEE OF THE WELLS
FAMILY TRUST, APPELLANT

V.

WELDON R. JOHNSON, JR., APPELLEE

On Appeal from the 46th District Court
Hardeman County, Texas
Trial Court No. 10,265; Honorable Dan Mike Bird, Presiding

August 28, 2014

OPINION

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

This appeal concerns title to 527.273 acres of land located near the Red River in Hardeman County, Texas. Appellant, Levada M. (Marie) Wells, Trustee of the Wells Family Trust (Wells), claims title to the disputed property by virtue of a chain of title from the sovereignty of the soil to the present. Appellee, Weldon R. Johnson, Jr., claims title to the same property by adverse possession. Following a jury trial in a trespass to try

title action and a verdict in favor of Johnson, the trial court entered judgment decreeing him to be the owner of the disputed property. On appeal, Wells asserts the evidence Johnson adversely possessed the disputed property was (1) legally and (2) factually insufficient, and (3) the trial court erred in admitting hearsay testimony regarding the construction of a designed enclosure or fence. We reverse the judgment of the trial court, render judgment decreeing Wells to be the rightful owner of the disputed property, and remand for further proceedings.

## BACKGROUND

### THE DISPUTED PROPERTY

The disputed property consists of 527.273 acres of land, more or less, out of (1) the north part of Section 9, C.&M. RR. Co. Survey, Abstract No. 549, (2) the north part of Section 10, C.&M. RR. Co. Survey,  Abstract No. 1851, and (3) the north part of Section 11, G.C.&S.F. RR. Co. Survey, Abstract No. 587, all located adjacent to the Prairie Dog Ford of the Red River in Hardeman County, Texas. The disputed property is represented by the shaded portion of the adjacent map.

2

THE FENCED PROPERTY

The disputed property is part of a larger tract of land (the "fenced property"), spanning west to east across Sections 9, 10, 11, 12, 13, bordered on the north by a "wash fence"[1] running generally northwest to southeast along the south bank of the Red River, and bordered on the south by a second fence (the "south fence") also running generally northwest to the southeast. These two fences run in a parallel fashion and extend northwest into Section 8, where they intersect, and southeast across Sections 9, 10, 11, 12 and 13, and then into Section 14, where they are connected by another fence. The disputed property is that land between the two fences which lies in sections 9, 10, and 11. Those portions of the fenced property in Sections 8, 12, 13 and 14 are not at issue here.

THE DISPUTE

As previously stated, Wells claims title to the disputed property by virtue of a chain of title from the sovereignty of the soil to the present, whereas Johnson claims title to the same property by virtue of adverse possession. It is undisputed that, but for Johnson's claim of ownership, Wells would own the disputed property and that she continues to own the adjacent property immediately south of the disputed property. Stated differently, Wells contends her property extends north all the way to the Red River, whereas Johnson contends the northern boundary line of her property is the

---

[1] At trial, Marie described the north fence as a "wash fence" because the fences were "hard to keep up" due to the fact that "the winds will blow the posts out or water will come and wash the post out." She described a wash fence as being insufficient to enclose cattle.

3

south fence line.[2]  On May 9, 2007, Wells filed this trespass to try title action asserting she was dispossessed of the disputed property by the unlawful entry and possession of the property by Johnson or his predecessors in title.  In addition to seeking a declaration of title, Wells sought possession, lost rent/profits, and attorney's fees.[3]  By his first amended original answer, Johnson asserted that "all or a portion" of the disputed property was created by accretion, thereby necessitating an "apportionment survey," which he contended was called for by the river frontage equitable apportionment method set out in *Sharp v. Womack*, 127 Tex. 357, 93 S.W.2d 712, 716 (Tex. 1936).[4]  Johnson further claimed title to the disputed property by virtue of the three, five, ten and both twenty-five year adverse possession statutes set forth in the Texas Civil Practice and Remedies Code.  *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 16.024, 16.025, 16.026, 16.027 and 16.028 (West 2002).[5]  For reasons discussed hereinbelow, our review is limited to Johnson's claims under §§ 16.026 (ten year) and 16.027 (twenty-five year).

---

[2] Ownership of the strip of land lying between the wash fence (the northern boundary of the disputed property) and the south bank of the Red River was not determined by the trial court's judgment.

[3] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.034(a) (West Supp. 2014).  *See also Cullins v. Foster*, 171 S.W.3d 521, 536 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (holding trial court had discretion to award attorney's fees in a suit for possession of real property, if the prevailing party recovers from a person claiming rightful possession under a claim of adverse possession).

[4] In *Sharp*, the Texas Supreme Court held that accretions to riparian lands should be equitably apportioned to the owners of adjoining lands in proportion to the river frontage of those lands as shown by the original field notes.  Because the disputed property is not riparian property defined by a call to river frontage (see footnote 2), this arcane apportionment theory was not submitted to the jury and has no application to the facts of this case.

[5] For convenience, unless otherwise indicated, subsequent references to the adverse possession provisions of the Texas Civil Practice and Remedies Code may be cited simply as "section ____" or "§ ____."

On July 21, 2009, the trial court entered an order granting Wells's motion for partial summary judgment, declaring that Wells had established, as a matter of law, title to the disputed property by virtue of a chain of title from the sovereignty of the soil to the present. The trial court later entered two separate orders granting Wells's no-evidence motions for partial summary judgment on Johnson's claims under the three and five year adverse possession statute of limitations claims.[6] In February 2012, a jury trial was held on Johnson's remaining adverse possession claims under the ten and twenty-five year statutes.[7]

The TRIAL

Suit for possession was filed on May 9, 2007. A trial was held in February 2012, and the following testimony was elicited:

MARIE WELLS—At trial, Marie testified her father-in-law, R.M. Wells, bought Sections 6, 7, 8, 9, 10, 11, and 16 in 1951. At the time, she and R.M.'s son, Robert Marvin "Sonny" Wells, Jr., were dating. When purchased, the property had four windmills and several corrals. In 1952, she, Sonny and some hired hands rebuilt the wash fence along the Red River and extended it the full length of the river bordering the disputed property. They also refurbished the corrals and extended them as well. The rebuilding of the wash fence was completed in August 1952.

---

[6] Johnson does not appeal the trial court's order granting partial summary judgment finding Wells established, as a matter of law, a chain of title to the disputed property from the sovereignty of the soil to the present. Neither does Johnson appeal the trial court's orders granting Wells's partial summary judgments on any action under the three year and five year adverse possession statutes. *See* §§ 16.024 and 16.025 (West 2002).

[7] §§ 16.026, 16.027 and 16.028 (West 2002).

In 1953, she, Sonny, and several hired hands built a second fence, the south fence, which was located several hundred yards south of the wash fence. South of that fence, Sonny and Marie ran cattle—normally about seventy head depending on the weather and grazing conditions. Sonny and Marie used the disputed property between the two fences to run heifers separated from other cattle until breeding time as well as cows getting ready to calve. They also "worked" cattle every year in August at the corrals between the wash fence and the south fence. In 1953-54, they sowed grass on the disputed property to improve grazing conditions.

In the late fifties, she and Sonny moved to town. Bill Ritchie was hired as a ranch foreman, where he worked the ranch until 1988 when he began working on an "as needed" basis. In December 1975, Sonny's father, R.M., passed and, in June of 1985, Sonny's mother passed, leaving the property to Sonny and his sister. In July of 1986, Sonny and his sister partitioned the land, with his sister receiving Sections 6, 7, 8 and 16, while Sonny received Sections 9, 10 and 11. Gary Naylor, a registered professional surveyor, testified at trial that the deeds to Sections 8, 9, 10 and 11, all called for a north-south boundary line, extending north to the Red River, and that he had surveyed the property and established a fence line between Sonny's and his sister's properties, i.e., between sections 8 and 9, passing across both the south fence line and the wash fence line. The partition fence, surveyed and built, ran north-south, all the way to the Red River, forming the western boundary of the disputed property. Marie testified no one ever objected to or questioned the fence's placement.

In 1989, Sonny and Marie leased their land for grazing to Doris Loveless, and then later to Kevin Martin, who has leased the land ever since. They began leasing

6

their land for quail hunting to two brothers from Oklahoma and Pat Keck. They also leased it to Charlie Brown to train dogs. From 1992 to the present, Pat Kennedy leased the land to hunt deer and turkey. Marie testified she and Sonny always paid the property taxes on their land, including the disputed property. She testified that, in all this time, she never saw cattle with anyone else's brand or ear tag and never saw any improvements being made to their land.

Marie further testified that sometime after March 2004, Johnson called her and asked if she wanted to sell the property. Johnson told her he bought some of their land, but she was uncertain what land he was talking about. She asked him if he received a warranty deed and told him she did not want to sell the property. Sonny died on March 9, 2005. After Sonny's death, Marie received several offers to buy the property, but she refused to sell. Later, she contacted Naylor and asked him to see about her land. He returned telling her she needed to do something because her land was being taken from her. She subsequently filed this trespass to try title action.

BARRY BRIDGES—Barry Bridges testified he was a farmer/rancher who knew Sonny all his life and was familiar with ranch land along the Red River in Hardeman County. He ranched and ran cattle directly west of the disputed property on land that also abutted the Red River. He was familiar with the fences on the disputed property—the wash fence and the fence several hundred yards to the south. He testified that sometimes when he ran cattle in the riverbed of the Red River they would wander onto Sonny's land. According to Bridges, Sonny was very particular about who went onto his property, and he always sought permission to enter Sonny's land before retrieving his stray cattle. He further testified that Ritchie, the Wells' foreman, would accompany

7

them whenever they were on Sonny's property. In all the times he was on the disputed property, he never saw any cattle other than the Wells' cattle. Further, he testified he did not know whether Johnson's predecessor in title, Blackie Moore, owned any land in the area.

PAT KECK—Pat Keck testified he was familiar with the land owned by Sonny and Marie because he leased the property for hunting purposes from 1986 to 1990. In 1986, before he leased the property, Sonny showed him the parameters of the property and the fence lines. At the time, the wash fence was fairly close to the river, and the land was low-lying river bottom, with salt cedars. Hunting was pretty good. He could see the river from the fence. During his tenure as a lessee, he did not see any cattle running on the land close to the river.

LUTHOR WISEMAN—Luthor Wiseman testified his grandfather, Bill Ritchie, worked for the Wells as foreman from 1960 to 1988, and thereafter "as needed." When his grandfather was foreman, Wiseman observed his grandfather check the Wells' cattle, build fences, feed cattle and work on windmills. He recalled repairing the wash fence running up close to the river with his grandfather when he was five or six years old. He testified they rode horses on the disputed property and recalled seeing wooden pens or corrals. He did not recall seeing any other cattle on the disputed property other than the Wells' cattle.

JAMES RAY MOORE—James Ray Moore testified that his father, Blackie Moore, first acquired land just north of the disputed property in the '50s. He became familiar with Blackie's cattle-stocker operation in 1964 when he was in high school and worked

8

approximately three weeks for Blackie.[8]  The disputed property was directly across the Red River from Blackie's property in Oklahoma and, in the '60s, the Moores thought the disputed property was actually a part of their Oklahoma land.  James testified that when he first became familiar with the property there was a wash fence, or high-water fence, along the south bank of the Red River bordering the north side of the disputed property.  Over Wells's hearsay objection, James testified Blackie told him he built the wash fence.  According to James, Blackie's cattle grazed the entire tract, from section 8 to section 14.  He testified he and Blackie expanded an existing corral, built a windmill,[9] maintained two windmills, cleaned water wells, sowed grass a few times in '64 or '65,[10] maintained the wash fence and maintained a second fence located south of the wash fence.  In the '60s, 100 to 150 head of cattle ran on the disputed property six to nine months out of the year.  According to James, in the '70s and '80s, Blackie began running as many as 300 head of cattle.

In January 1981, Blackie and his wife gave their two daughters a warranty deed to the fenced property.  The following day Blackie's daughters deeded the property back to Blackie but retained a one-half interest each in the mineral estate.[11]  In the early '90s,

---

[8] James testified that a "cattle-stocker operation" was where you buy 300 to 400 pound cattle and keep them until they reach 800 to 900 pounds and then sell the cattle.

[9] James testified Blackie told him he built the only corrals and windmills on the disputed property over Wells's objection that the testimony was inadmissible hearsay.

[10] James sowed Bermuda grass by running a grass drill in various places among the mesquites to improve grazing for the cattle.  He testified at trial he did not "know if you would call it cultivated," but "[w]e sowed improved grass in there."  He did not describe where on the ground the grass was sown.

[11] The recording of a deed is only constructive notice of its contents to those whose duty it is to search the records.  *D. T. Carroll Corp. v. Carroll*, 256 S.W.2d 429, 434 (Tex. Civ. App.—San Antonio 1953, writ ref'd n.r.e.).  Persons who hold good title to property, such as Wells, do not have a duty to search the records daily to determine what subsequent instruments have been filed affecting title to their property.  *Id.*  It is *subsequent* purchasers and creditors who are required to take notice of the filing of an

Blackie suffered a stroke and was no longer able to operate the cattle-stocker operation.[12] After Blackie's cattle were sold, James continued to own and operate the Moore property—on the Oklahoma side of the Red River. No cattle were grazed on the disputed property "[p]robably not more than a year or two at the most," until it was sold to Mike Cary.

In 1992, Blackie quit-claimed the fenced property to Cary, and Blackie's daughters transferred their mineral interests to Cary's wife, Dana, in return for a $10,000 down payment and a note for $40,000. Cary grazed cattle on the fenced property. In 1996, Cary was unable to make his payments on the note, so he quit-claimed the property back to Moore Land and Cattle Corporation (MLCC). MLCC subsequently leased the property to David and Lavinda Smith. Smith also ran cattle over the entire property. In 1997, MLCC quit-claimed the property to the Smiths in return for a down payment of $10,000 and a $50,000 note. The Smiths subsequently sold the property to Johnson and, on March 4, 2004, the Smiths quit-claimed the property to Johnson.

James testified no one ever interfered with Blackie's use of the fenced property. He also testified that neither Blackie nor MLCC ever paid any property taxes on the disputed property. He testified he did run-off some quail hunters and four-wheelers on

_____

earlier filed deed or instrument. *Id.* Therefore, under the facts of this case, the recording of these deeds is inconsequential to the issue of adverse possession.

[12] After Blackie suffered a stroke, James set up Moore Land and Cattle Corporation, an Oklahoma corporation. Blackie and his wife conveyed all their property to the corporation. The primary shareholders were James's wife and his wife's sister. When Blackie's wife passed in 2005, James's two children bought out his wife's sister and James's family now owns 100% of the corporation. Blackie passed in the late '90s.

10

several occasions in the '70s and '80s but failed to identify whether the hunters and four-wheelers were on the disputed property or other portions of the fenced property. James also contacted Laramie McEntyre in the '80s and asked for an easement across McEntyre's property to reach the disputed property from the west. McEntyre granted him an easement.

MIKE CARY—Mike Cary testified he grazed cattle on the entire fenced property. The fenced property was remote, and he hardly ever saw anyone when he was on the land. He ran his cattle in June, July and August, testifying the land would support as many as 220 head on the native grass but only for a short period. In addition to stocker cattle, he also had a cow-calf operation he ran throughout the year, and he performed repair work on the fences and windmills. He did not use the property for hunting or fishing.

DAVID SMITH—David Smith testified he was running cattle on Section 8 immediately west of Section 9,[13] when James asked if he was interested in purchasing the fenced property. Before accepting James's offer, Smith visited Sonny. Smith testified "I told Sonny that I was wanting to buy the Blackie Moore property that laid between him and the river." Smith "asked Sonny if he had any claim to the land because Blackie had been grazing. He told me—he said when we built that [fence south of the wash-fence] we didn't want the property at that time and he said I don't want it now. He said as far as I'm concerned, that's Blackie Moore's."

---

[13] Sonny's sister sold section 8 to Steve Griffith.

Smith testified he grazed approximately 100 cattle on the fenced property during the summertime and moved the cattle back to the Griffith Place in the winter. He "[r]an his cattle plumb to the other end of the whole expanse of property"—"[a]lot of times the grass was better [on the east end towards Sections 13 and 14], and a lot of times you'd find the cattle down on that end." He also maintained the fences, put some water tanks out, hunted possibly once a year and leased the land for bird hunters. Smith did not pay any property taxes on the fenced property, and he paid off MLCC when he sold the fenced property to Johnson. He testified there was really no other purpose for the fenced property other than hunting and running cattle.

CHANCE JOHNSON—In 2004, Chance Johnson assisted Johnson, his father, with the purchase of the fenced property. He testified that, prior to the purchase, he called Sonny to inquire whether he wanted to sell his property. Chance told Sonny that "Blackie's old place" was under contract to purchase from Smith. Sonny did not respond but told Chance he was not interested in selling his property. Sonny also told Chance that Blackie came "down onto the river" and started running cattle there in 1953. Chance asked if Sonny had any claim to the land Smith was selling to Johnson, and Sonny responded he "had no interest in the place."

Chance also testified he helped his father report the fenced property for property tax purposes to the tax assessor's office. After buying the fenced property in 2004, he and his father built two new fences, added roads, widened roads, added culverts, cleared some timber, created an annual food plot or wheat field and cleared brush on the fenced property. Chance did not specify where on the ground any of the improvements were actually located other than that the improvements related to the

12

fenced property. He did testify the Johnsons used the property for general recreation and hunting by guests.

WELDON JOHNSON, JR.—Johnson first became aware of the property in January 2004 when he, Chance and Smith drove across the fenced property after hunting nearby. Before purchasing the fenced property, he called Sonny and asked if he wanted to sell his property. Sonny said he was not interested. Johnson then told Sonny that he "was planning to purchase the property between him and the river that David Smith owned." Sonny made no response. Johnson asked Sonny if he was claiming ownership to the property, and Sonny replied Blackie had taken the place long ago. After Sonny's death, Johnson subsequently asked Marie Wells if she was interested in selling her property, and she too said no.

Johnson relied on Chance to complete the purchase. He subsequently built some fences, fixed some culverts, built roads, widened existing roads and made certain portions accessible in the fenced property. He used the property for recreational purposes and, during hunting season, visited every weekend. During off season, he visited one or two weekends a month—staying in a thirty foot travel trailer that was not located on the disputed property. Since 2004, he has paid property taxes on the fenced property. He also applied for a wildlife management property tax exemption. He obtained an easement from Steve Griffith to access the fenced property from the west by traversing the Griffith Place along the Red River. He testified he paid $154,000, or approximately $175 an acre, for the fenced property and received a quit-claim deed from Smith.

ROBERT MARVIN WELLS III—Robert Wells III is Sonny's son. In 1986, the Wells family sold off all their cattle and leased the property to Loveless for grazing. He testified that Dale Martin and his son, Kevin, currently lease the property, and they have done so ever since the Loveless lease terminated. Robert testified he never saw anyone else's cattle on the disputed property between 1986 and 2007.

KEVIN DALE MARTIN—Kevin Martin testified that he and his father have leased the Wells property for grazing since 1992. Kevin did not recall grazing north of the south fence line because that property consisted of tall salt grass and the wash fence was "so-so at best." Since 1992, Kevin had concerns about grazing in the area between the two fences because he was concerned the wash fence might not be able to turn the cattle. Kevin testified the cattle did not graze between the south fence and the wash fence due to the condition of the wash fence and the possibility cattle would get out and cross the Red River into Oklahoma. Kevin testified that if their cattle wandered over to Oklahoma, it would be very difficult to get them back. Since leasing the property, the most cattle Martin had ever observed on the disputed property between the wash fence and the south fence was half a dozen.

THE VERDICT AND JUDGMENT

In response to the charge of the court, the jury found that prior to May 9, 2007, the date Wells filed her trespass to try title suit, Johnson, or his predecessors, had held the disputed property in peaceable and adverse possession by cultivating, using, or

14

enjoying that property for both a ten year and twenty-five year period.[14]  The trial court subsequently issued its *Final Judgment* awarding title and possession of the disputed property to Johnson.  This appeal followed.

## ADVERSE POSSESSION

The doctrine of adverse possession is based on statutes of limitation for the recovery of real property.  *See* §§ 16.021–.037 (West 2002 and West Supp. 2014).  Thus, in the context of a dispute concerning possession of real property, the rightful owner of the property must institute suit within a specified period of time (three, five, ten or twenty-five years depending on various statutory factors and conditions) or subsequently be barred from recovery.  Not only are suits for the recovery of possession by the rightful owner barred, adverse possession provisions also operate to vest the adverse claimant with title to the property.  *See* § 16.030 (a) (West 2002).  Therefore, "[t]he concept of adverse possession allows a person to *claim* title to real property presently titled in another."  *Session v. Woods*, 206 S.W.3d 772, 777 (Tex. App.—Texarkana 2006, pet. denied) (emphasis in original).

Due to the harsh nature of disenfranchising someone of title otherwise rightfully held, establishing title by adverse possession is not well-regarded in the law, and the statutory prerequisites must be strictly complied with.  *See Thomas v. Southwestern*

---

[14] It should be noted that Johnson plead both twenty-five year limitations periods, §§ 16.027 and 16.028.  Section 16.027 pertaining to claims by someone who "cultivates, uses, or enjoys the property"; and, § 16.028 pertaining to claims by someone who "holds the property in good faith and under a deed or other instrument purporting to convey the property that is recorded in the deed records of the county where any part of the real property is located."  Although Johnson made claims under both statutes, the jury returned an adverse verdict to the claim made pursuant to § 16.028.  Johnson did not appeal that finding.  Accordingly, our discussion concerning the twenty-five year limitations period will be limited to the provisions of § 16.027 only.

*Settlement & Development Co.*, 131 S.W.2d 31, 34 (Tex. Civ. App.—Beaumont 1939, writ dism'd judgm't cor.). "One seeking to establish title to land by virtue of the statute of limitations has the burden of proving every fact essential to that claim by a preponderance of the evidence." *Rhodes v. Cahill*, 802 S.W.2d 643, 645 (Tex. 1990); *Osborn v. Deep Rock Oil Corp.*, 153 Tex. 281, 286, 267 S.W.2d 781, 787 (1954) (holding that adverse claimant has the burden to prove every fact necessary to that claim by "clear and satisfactory" evidence). Thus, the burden of proving each essential element is on the party claiming title by adverse possession. *Fuentes v. Garcia*, 696 S.W.2d 482, 484 (Tex. App.—San Antonio 1985, no writ) (citing *Davis v. Carriker*, 536 S.W.2d 246, 251 (Tex. Civ. App.—Amarillo 1976, writ ref'd n.r.e.)). *See Moore v. Stone*, 255 S.W.3d 284, 288 (Tex. App.—Waco 2008, pet. denied).

Under Texas law, courts have interpreted every claim of adverse possession as encompassing at least six essential elements: (1) visible appropriation and possession of the disputed property; (2) that is open and notorious; (3) that is peaceable; (4) under a claim of right; (5) that is adverse and hostile to the claim of the owner; and (6) consistent and continuous for the duration of the statutory period. *Glover v. Union Pac. R.R.*, 187 S.W.3d 201, 213 (Tex. App.—Texarkana 2006, pet. denied). *See* § 16.021(1) (West 2002). It has been said that adverse possession requires "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 69 (Tex. 2011) (quoting § 16.021(1)).

In order to satisfy the elements of an adverse possession claim, the claim of the adverse claimant must be inconsistent with and hostile to the claim of the rightful title holder. *Id.* at 69-70. Therefore, to claim property through adverse possession, "the possession must be of such character as to indicate *unmistakably* an assertion of a claim of *exclusive* ownership in the occupant." *Rick v. Grubbs*, 147 Tex. 267, 270, 214 S.W.2d 925, 927 (1948) (emphasis in original). In determining what constitutes an unmistakable claim of ownership, hostile to the rightful owner, considerable importance is attached to the nature of the land and its usual and customary uses. *Wall v. Carrell*, 894 S.W.2d 788, 801 (Tex. App.—Tyler 1994, writ denied). "It is well settled, that, where a party relies upon naked possession alone as the foundation of his adverse possession claim, it must be such an actual occupancy as the law recognizes as sufficient, if persisted in for a long enough period of time, to cut off the true owner's right of recovery." *Rhodes*, 802 S.W.2d at 645.

DESIGNEDLY ENCLOSED

While the fencing of land has long been recognized as visible appropriation of the property enclosed, *Kinder Morgan North Tex. Pipeline, L.P. v. Justiss*, 202 S.W.3d 427, 439 (Tex. App.—Texarkana 2006, no pet.), use of the land for grazing cattle, along with other related uses, is insufficient to establish title by adverse possession where the disputed land was incidentally enclosed by a casual fence. *See Mendoza v. Ramirez*, 336 S.W.3d 321, 329 (Tex. App.—El Paso 2010, pet. denied) (holding no adverse possession shown by family gatherings on property separated by a casual fence); *Mead v. RLMC, Inc.,* 225 S.W.3d 710, 715 (Tex. App.—Fort Worth 2007, pet. denied) (grazing

of land insufficient possession where unaccompanied by actual occupancy or open use); *Harlow v. Giles,* 132 S.W.3d 641, 647 (Tex. App.—Eastland 2004, pet. denied) (finding "[t]he law is well settled that the mere grazing of land incidentally enclosed by a fence created by others cannot support a claim of adverse possession. [Citations omitted.]"). Without more, mere fencing or the erection of other improvements will not ripen into title without "actual and visible appropriation." *Dunn v. Taylor*, 102 Tex. 80, 86, 113 S.W.2d 265 (1908).

Therefore, if the disputed property is range land and the adverse claimant is relying on mere grazing of livestock to show adverse use, the claimant must also show that the property is "designedly enclosed" by a fence. *See Rhodes*, 802 S.W.2d at 645 (finding the isolated sale of cedar trees and the clearing of land for the grazing of cattle and goats was insufficient to establish adverse possession where tract was not designedly enclosed); *King Ranch, Inc. v. Garcia*, No. 04-13-00605-CV, 2014 Tex. App. LEXIS 8522 (Tex. App.—San Antonio Aug. 6, 2014, no pet. h.) (mem. op.) (finding evidence that claimant had family gatherings on the property, grazed cattle, hunted and occasionally grew crops was insufficient to establish actual visible appropriation where fence existed before the claimant took possession); *Moore*, 255 S.W.3d at 289 (holding no adverse possession of property enclosed by casual fence where only use was grazing, cutting hay and sporadic cultivation); *Harlow*, 132 S.W.3d at 648 (finding use of property for grazing of livestock and occasional hunting, including the construction of deer blinds and deer feeders, was insufficient to establish adverse possession where claimant failed to establish a "designed enclosure").

Under applicable case law, fences are classified as either "casual fences" or fences that "designedly enclose" an area. *Id.* at 646; *King Ranch, Inc.* 2014 Tex. App. LEXIS 8522, at *15. "If the fence existed before the claimant took possession of the land and the claimant fails to demonstrate the purpose for which it was erected, then the fence is a 'casual fence.'" *Rhodes*, 802 S.W.2d at 646 (citing *Osborn*, 267 S.W.2d at 786). Moreover, repairing or maintaining a casual fence, even for the purpose of keeping the claimant's animals within the enclosed area, generally does not change a casual fence into a designed enclosure. *Id.* Only if the claimant substantially modifies a casual fence thereby changing the fence's character may the fenced-in area become a designed enclosure. *Harlow*, 132 S.W.3d at 647. The "designed enclosure rule" applies whether or not an open range law is in effect in the county. *Terrill v. Tuckness*, 985 S.W.2d 97, 108-09 (Tex. App.—San Antonio 1998, no pet.).

CONSISTENT AND CONTINUOUS CLAIM

Possession of the claimed property must also be consistent and continuous, uninterrupted by temporary vacancy, unless duration of vacancy is reasonable under existing circumstances which reasonably show the adverse claimant did not thereby intend to abandon the premises. *Grayson v. Dunn*, 581 S.W.2d 785, 788 (Tex. Civ. App.—Waco 1979, writ ref'd). So long as a claimant's predecessors in interest meet all the requirements of adverse possession, a claimant may meet a statutory limitations period by tacking the claimant's period of possession with that of his predecessors in interest. *BP Am. Prod. Co.*, 342 S.W.3d at 69. *See* § 16.023 (West 2002).

19

CULTIVATION, USE AND ENJOYMENT

In addition to the general elements of adverse possession discussed above, under both the ten and twenty-five year statutes applicable in this case, in order to acquire title by adverse possession the property must be held by a claimant who "cultivates, uses, or enjoys the property."[15] The cultivation, use or enjoyment of the property must be of such character as would give the true owner notice of the hostile nature of the claim. *Rhodes*, 802 S.W.2d at 645-46; *Kinder Morgan North Tex. Pipeline, L.P.,* 202 S.W.3d at 439-441 (adverse possession established where claimant designedly enclosed tract, continuously grazed cattle, maintained property, dug a stock pond, rebuilt and maintained levee, hired contractors to do bulldozer work on levee, sprigged ground, planted Bermuda grass, filled in slough, and cut an emergency spillway); *Parkins v. McGehee,* 133 S.W.3d 287, 293 (Tex. App.—Fort Worth 2004, no

---

[15] The applicable sections of the Texas Civil Practice and Remedies Code are the following:

Section 16.026 – Adverse Possession: 10-Year Limitations Period

(a) A person must bring suit not later than 10 years after the day the cause of action accrues to recover real property held in peaceable and adverse possession by another who *cultivates, uses, or enjoys the property.*
(b) Without a title instrument, peaceable and adverse possession is limited in this section to 160 acres, including improvements, unless the number or acres actually exceeds 160. If the number of enclosed acres exceeds 160 acres, peaceable and adverse possession extends to the real property actually enclosed.
(c) Peaceable possession of real property held under a duly registered deed or other memorandum of title that fixes the boundaries of the possessor's claim extends to the boundaries specified in the instrument.
(Emphasis added).

Section 16.027 – Adverse Possession: 25-Year Limitations Period
Notwithstanding Disability

A person, regardless of whether the person is or has been under a legal disability, must bring suit not later than 25 years after the day the cause of action accrues to recover real property held by peaceable and adverse possession by another who *cultivates, uses, or enjoys the property.*
(Emphasis added).

pet.) (adverse possession established where (1) tract constantly used for grazing, (2) tract contiguous to claimant's record title land, fenced within it and both tracts operated as a single unit, (3) ranch manager rebuilt and replaced water-gapped portions of fence, modified portions of fence and always maintained fence, and (4) general reputation in the community had always been that the disputed property was part of claimant's ranch). The burden of proof is on the claimant to establish such cultivation, use or enjoyment by a preponderance of the evidence. *RLMC, Inc.*, 225 S.W.3d at 715.

## ISSUE THREE—HEARSAY

For purposes of logical sequence, we will first address Wells's third issue concerning whether the trial court erred in admitting the testimony of James Ray Moore concerning statements made to him by Blackie regarding Blackie's construction of the wash fence. In particular, Wells contends the statements were inadmissible hearsay, offered in evidence in violation of Rule 802 of the Texas Rules of Evidence. Johnson contends the statements were admissible under an exception to the hearsay rule. He further contends the statements were cumulative of other probative evidence, and therefore, any error in admitting the statements was harmless.[16]

### ANALYSIS

Marie's direct testimony was that the wash fence forming the northern border of the disputed property, and generally tracking the southern bank of the Red River, was

---

[16] Wells also objected to James's testimony concerning hearsay statements made to him by Blackie regarding the construction of corrals and windmills; however, she does not raise those complaints on appeal. Because those statements deal with the nature and character of the adverse use of the disputed property, and not the issue of a "designed enclosure," we will assume, for purposes of this opinion, the trial court did not err in admitting those statements.

21

*rebuilt* by her and Sonny in 1952, implying that the fence existed prior to that date.  On the other hand, James's testimony was that his father told him he built the wash fence when he first acquired land in Oklahoma, just north of the disputed property in Texas.[17] To the extent that this statement was being offered in evidence to prove the truth of the matter asserted, i.e., that Blackie built the wash fence, it was a hearsay statement.  TEX. R. EVID. 802(d) (defining a hearsay statement as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").  *See Tuckness,* 985 S.W.2d at 110 (claimant's testimony that predecessor in title told him he chased hunter off disputed land was hearsay); *Hernandez,* 611 S.W.2d at 736-37 (son's statement that his deceased father told him he did not want to knock down trees on disputed property because he was not sure who owned the property was hearsay); *Boettcher v. Gould,* 577 S.W.2d 806, 807-08 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.) (testimony that father told claimant that the county built the fence when the road was created was hearsay); *Green v. Blanks,* 342 S.W.2d 141, 148 (Tex. Civ. App.—Austin 1960) (son's testimony as to what his deceased father said about use of the property was hearsay).

Johnson contends Blackie's statements concerning construction of the wash fence were admissible as an exception to the hearsay rule in order to explain the nature and character of Blackie's possession of the disputed property and to show the extent of his interest and the character of his holding.  Relying on *Powell v. Jackson,* 320 S.W.2d 20, 24-25 (Tex. Civ. App.—Amarillo 1958, writ ref'd n.r.e.), and *Nagel v. Kiibler*, 212 S.W.2d 1009, 1011 (Tex. Civ. App.—Galveston 1948, writ ref'd n.r.e.), Johnson

---

[17] Chance testified that Sonny told him Blackie began running cattle in the area in 1953, implicitly contradicting Marie's testimony that the fence existed in 1952.

contends the statements are admissible because they demonstrate Blackie's *intent* to claim the property adversely and use it for his own purposes. *Powell* and *Nagel* are inapposite, however, because they deal with statements offered to prove the *state of mind of the declarant*, not the fact asserted. Johnson fails to cite us to any hearsay exception under Rule 803 of the Texas Rules of Evidence applicable to the facts of this case, and we find none. As such, Wells's third issue is sustained, and James's testimony recounting Blackie's hearsay statements regarding construction of the wash fence was inadmissible for purposes of establishing that Blackie built that fence.[18]

### ISSUES ONE AND TWO—LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE

By her first and second issues, Wells asserts Johnson's evidence is legally and factually insufficient to establish the elements of adverse possession. Particularly, Wells contends the evidence is legally and factually insufficient to establish that Johnson, or his predecessors, (1) adversely possessed or (2) maintained continuous possession of the disputed property. We agree.

#### STANDARD OF REVIEW

When both legal and factual sufficiency challenges are raised on appeal, the reviewing court must first examine the legal sufficiency of the evidence. *See Glover v. Tex. Gen. Indemnity Co.,* 619 S.W.2d 400, 401 (Tex. 1981). In conducting a legal sufficiency review, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that supports the verdict. *City of Keller v.*

---

[18] Determination of whether the erroneous admission of this evidence was harmless is pretermitted by our resolution of issues one and two. *See* TEX. R. APP. P. 47.1.

23

*Wilson,* 168 S.W.3d 802, 821-22 (Tex. 2005). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827. In conducting our review, we must "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.*

The trier of fact is the sole judge of the credibility of the witnesses and of the weight to be given to their testimony. *Id.* at 819. The reviewing court may not substitute its judgment for that of the jury, so long as the evidence falls within the zone of reasonable disagreement. *Id.* at 822. But if the evidence allows only one inference, neither the jurors nor the reviewing court may disregard it. *Id.*

In reviewing a legal sufficiency issue, we may sustain the challenge only when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence, or (d) the evidence conclusively establishes the opposite of the vital fact in question. *Keller* 168 S.W.3d at 810; *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied,* 541 U.S. 1030, 124 S.Ct. 2097, 158 L.Ed.2d 711 (2004) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). A scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Havner*, 953 S.W.2d at 711). Evidence does not exceed a scintilla if it is so weak as to do no more than to create a mere surmise or suspicion that the fact exists. *Id.*

24

In reviewing factual sufficiency, the reviewing court must consider, examine, and weigh the entire record, considering both the evidence in favor of, and contrary to, the challenged findings. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406-07 (Tex. 1998), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998). In doing so, the court no longer considers the evidence in the light most favorable to the finding; instead, the court considers and weighs all the evidence and sets aside the disputed finding only if it is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Id.* at 407.

ANALYSIS

In this case, because the trial court previously granted a partial summary judgment in favor of Wells on Johnson's claims of adverse possession under the three year and five year statutes, §§ 16.024 and 16.025 respectively, the trial court submitted to the jury issues pertaining to the three remaining statutory sections: (1) § 16.026 (ten year), (2) § 16.027 (twenty-five year), and (3) § 16.028 (twenty-five year).[19] The jury returned a verdict favorable to Johnson under §§ 16.026[20] and 16.027,[21] but

---

[19] Johnson did not appeal the trial court's orders granting partial summary judgment pertaining to his claims under the three year and five year adverse possession limitation statutes. *See* §§ 16.024-.025 (West 2002).

[20] Question No. 1—Do you find that [Johnson], or his predecessors, has held [the disputed property] in peaceable and adverse possession by cultivating, using, or enjoying such lands for any ten-year period before May 9, 2007?
Answer: "Yes"

[21] Question No. 2.—Do you find that [Johnson], or his predecessors, has held [the disputed property] in peaceable and adverse possession by cultivating, using, or enjoying such lands for any twenty-five-year period before May 9, 2007?
Answer: "Yes"

unfavorable as to § 16.028.[22] Because Johnson does not appeal the jury's unfavorable verdict pertaining to § 16.028, we will limit our discussion to §§ 16.026 and 16.027 only. As to the six essential elements comprising an adverse possession claim, Wells has focused her insufficiency of the evidence claims on two elements: (1) whether Johnson's claim was adverse and hostile to her claim of ownership and (2) whether his possession was consistent and continuous for the duration of the statutory period.

### (1) ADVERSE AND HOSTILE

Here, the disputed property consists of remote ranch land with limited improvements. It is bounded on the south by the "south fence" constructed by Sonny and Marie Wells; on the west by a partition fence erected by the Wells to separate Section 8 from Section 9; on the north by a "wash fence" of unknown origin;[23] and on the east by open ranch land.[24] While there was conflicting testimony that Johnson's predecessors may have maintained some of the fences, there was no competent evidence that they significantly changed the character of the enclosure. Because no one testified to the purpose for construction of the wash fence when built and because Marie's testimony establishes the wash fence existed before her father-in-law bought the disputed property in 1951, for purposes of determining whether Blackie, Cary, Smith

---

[22] Question No. 3—Do you find that [Johnson], or his predecessors, has held [the disputed property] in good faith and under a deed or other instrument purporting to convey such lands that is recorded in the deed records of Hardeman County, Texas for any twenty-five-year period before May 9, 2007?
Answer: "No"

[23] Other than the inadmissible hearsay statement previously discussed, the undisputed evidence was that the wash fence existed prior to 1952, predating any acts relied upon by Johnson to establish adverse possession.

[24] While the disputed property itself consists of portions of Sections 9, 10 and 11, it is part of a larger fenced tract which includes portions of Sections 12, 13 and 14.

or Johnson adversely possessed the disputed property, we must consider the wash fence a casual fence. As such, we conclude the disputed property was not designedly enclosed. To the contrary, evidence established that the wash fence was so insecure it would not "turn" livestock and from time to time cattle from nearby ranches would wander onto the property.

Furthermore, evidence established that any use by Blackie and his successors was not exclusive because Sonny and Marie also used the disputed property to separate and corral their cattle without interference. According to the testimony of Wells, Keck and Wiseman, other than the occasional stray cow from a nearby ranch, no one ever saw anyone else's cattle on the disputed property. While there was testimony concerning the maintenance of the fences, corrals and windmills on the property, there was insufficient evidence of actual and visible appropriation of the disputed property that was inconsistent with and hostile to Wells's claim of ownership for the requisite period of time.

Johnson also contends Sonny had actual knowledge of Blackie's claim to the disputed property and that such knowledge was a substitute for appropriation and possession that was open, notorious, adverse and hostile to Sonny's claim of ownership. Johnson bases this position on three conversations: one between Smith and Sonny, one between Chance and Sonny, and one between Johnson and Sonny.

In the first conversation, Smith visited Sonny in 1997 and told him he "was wanting to buy the Blackie Moore property that laid between [Sonny] and the river." He asked Sonny if he had any claim to the land Blackie had been grazing, and Sonny

responded that he did not want the property. He told Smith "as far as I'm concerned, that's Blackie Moore's." When Sonny's statements were made, Blackie was no longer in possession of the disputed property, and there is no evidence Sonny was aware of any other claim. The statement does not describe what Sonny considered Blackie's property to be, or when he considered it to have been Blackie's, or whether he believed Blackie's use to be adverse. In fact, evidence showed Sonny thought Blackie ran his cattle "down at the river." At best, Smith's statement is evidence that, in 1997, Sonny received notice that, at one time, Blackie grazed cattle in the salt cedars near the river. Such evidence creates a "mere surmise or suspicion" that Blackie possessed the disputed property adverse to Sonny's interest. *See Ford Motor Co.,* 135 S.W.3d at 601.

Moreover, we need not address Sonny's statements to Chance and Johnson or *vice versa* because, even if we were to find that Sonny had received sufficient notice in 2004 that Smith was in possession of the disputed property or that Johnson in fact purchased that property from Smith, such notice would be legally insufficient because those conversations occurred less than ten years prior to the filing of suit. To the extent either of those statements might indicate earlier knowledge of an adverse claim, we are left to speculate as to when. Furthermore, Chance's testimony was that Sonny told him "I have no interest in [the property Johnson was buying from Smith which was identified as 'Blackie Moore's old place']." A significant problem with this conversation is that the property in question was never identified.[25] While the conversations between Sonny

---

[25] Chance Johnson testified as follows:

Q.     Can you tell us whether or not you told him what you and your dad's intentions were about purchasing the [disputed property]?

28

and both Smith and Johnson were somewhat more specific as to the property in question,[26] Johnson's argument fails to address how Sonny's awareness, if any, of Blackie's claim was a substitute for "cultivation, use or enjoyment of the property," an essential element of his adverse possession claim.

Similarly, evidence concerning any use or improvement of the property by Johnson would be legally insufficient to satisfy the essential elements of adverse possession because those acts occurred less than ten years prior to the filing of suit for possession. Under these facts, we find the evidence was legally and factually insufficient to establish that their claim was exclusive, adverse and hostile.

CONSISTENT AND CONTINUOUS

Undisputed testimony further established there were significant periods when no one was grazing cattle within the fenced property, much less the disputed property. The evidence was that Blackie had cattle on the property only four to six months out of each year and that when Blackie ceased his cattle operations in the early '90s, James conducted the remaining cattle business on the Oklahoma side of the Red River.

_____

A.  I did. I told him my father had Blackie Moore's old place under contract to purchase from David Smith and . . . .

Q.  Did you identify the property in any other way?

A.  No.

[26] Smith identified the property as "the Blackie Moore property that laid between [Sonny] and the *river*," while Johnson identified the property as "the property between [Sonny] and the *river* that David Smith owned." As previously noted, the disputed property does not abut the Red River but instead lies between the wash fence and the south fence, both of which lie south of the south bank of the river. Smith goes on to pontificate that Sonny understood that to mean the property north of the south fence because it was his expressed desire to "stay out of the salt cedars."

According to James's deposition testimony, there were no cattle on the disputed property "[p]robably not more than a year or two at the most," between the cessation of Blackie's cattle operations and the sale of the property to Cary. Testimony further established that from around 1992 to 1994 Cary only grazed cattle during the summer months and that from 1997 until 2004, Smith did the same. Furthermore, testimony established that when cattle were grazed on the property, they would randomly migrate within the larger fenced tract (not on the disputed property), depending on the availability of grassland. Accordingly, the grazing of cattle was insufficient to establish consistent and continuous possession. Issues one and two are sustained.

## CONCLUSION

After reviewing the record, we conclude the evidence is legally and factually insufficient to support a finding of actual and visible appropriation of the disputed property, commenced and continued under a claim of right that is inconsistent with and hostile to the claim of Wells for the period of time required to establish adverse possession under §§ 16.026 or 16.027. Accordingly, the trial court's judgment is reversed and we render judgment, in part, in favor of Wells on the issue of ownership of the disputed property. We also remand this action to the trial court for further proceedings to determine whether Wells is entitled to an award of damages, attorney's fees and costs of court.

Patrick A. Pirtle
Justice

30