

In The

Court of Appeals

Seventh District of Texas at Amarillo

No. 07-18-00016-CV

BENJAMIN CAINE RIDDLE, APPELLANT

V.

RONALD JOE SMITH, GREGORY JOHN GANSS, ANGELA G. GANSS, AND ALFRED
W. GANSS, JR., APPELLEES

On Appeal from the 46th District Court
Wilbarger County, Texas
Trial Court No. 27,748, Honorable Dan Mike Bird, Presiding

September 6, 2018

## MEMORANDUM OPINION ON MOTION FOR REHEARING

Before QUINN, C.J., and PIRTLE and PARKER, JJ.

Pending before the court is a motion for rehearing. We grant same, withdraw our prior opinion, and substitute this one in its stead.

This appeal involves the issue of adverse possession. Benjamin Caine Riddle was the record or titled owner of the 17 acres of rough ranch land in question. He purportedly lost ownership to the acreage under the doctrine of adverse possession. Approximately half of the 17 acres became the property of Ronald Joe Smith (Smith) while the other half became the property of Gregory John Ganss, Angela G. Ganss, and Alfred W. Ganss (collectively referred to as Ganss) through application of the doctrine. Invoking the claim

of trespass to try title, Smith and Ganss sued Riddle to claim the property after Riddle engaged in efforts to clear portions of it. Trial was to the court, which body ruled in favor of Smith and Ganss. Riddle appealed, asserting three issues. Two concern the legal and factual insufficiency of the evidence to support the trial court's finding of adverse possession; they focus upon whether or not grazing alone on the disputed acreage would support a finding of adverse possession if the subject land is or is not enclosed. The third issue also implicates the sufficiency of the evidence, but its focus lies upon the trial court's decision to award Smith and Ganss title to land under a public roadway. We reverse and remand in part.

*Background*

As mentioned, the parcel of land consists of about 17 acres (disputed parcel) laying east of but abutting County Road 103 in Wilbarger County (CR 103). The parties describe it as consisting of rough terrain with breaks ranging from 10 to 12 feet deep. If visualized on a map, it could be likened to a bulge that follows the contour of CR 103 as the road curves around the deep breaks. According to the record, the land was previously made the subject of the H&TC RR land survey. That survey actually placed the 17-acre bulge into sections 26 and 27 of the surveyed land. The county road was also placed in those two sections.

Separating the road from the western edge of the bulge, though, is a multi-stranded barbed-wire fence containing two gates (i.e., the road fence). No one testified as to the exact date on which the fence was built or who built it. However, evidence indicates that it had been in existence for over 40 years. The same fence also separates the disputed parcel from those portions of sections 26 and 27 found west of the road fence.

2

Unlike the western edge of the bulge, its eastern edge (i.e., the edge demarcating the eastern border of sections 26 and 27) has no fence. It simply abuts sections 29 and 30 without indication of where sections 26 and 27 end and 29 and 30 begin.

Smith acquired section 30 from a relative in 1971.[1] Ganss bought section 29 in 2010 from Shelton, who bought it in 2000 from McDuff, who inherited it from Sullivan, who bought it in 1968 from Smith's uncle. Prior to the acquisition of section 29 by Sullivan, it and section 30 had no fence or like structure depicting the northern and southern borders of sections 29 and 30, respectively.[2] A fence, though, was built demarcating the boundary (i.e., the dividing fence) soon after Sullivan bought the property, and the builder connected the western end of the dividing fence to the road fence. So connecting the dividing and road fences effectively dissected the disputed parcel between a portion north of the dividing fence and a portion south of the dividing fence. Yet, there remained no fence that divided the eastern edge of the disputed parcels from sections 29 and 30.

In addition to the dividing fence, Sullivan also built or installed structures onto the disputed property, or at least upon the part south of the dividing fence. They consisted of cattle pens and a milk truck or like vehicle capable of being used for storage. Both structures were visible from CR 103, and both were used for the purpose of maintaining a cattle operation upon both section 29 and the disputed land. Apparently, Sullivan grazed cattle upon section 29 and the portion of the bulge abutting it. When it came time to sell the livestock, they were moved onto the bulge and into the pens. The cattle would then be moved from the pens through a gate maintained within the southern portion of

---

[1] Though Smith does not own the entirety of section 30, we allude to him as owning it here to simplify an understanding of the properties involved.

[2] Like Smith, Ganss and his predecessors in title did not own all of section 29, but we, nonetheless, allude to him as owning it here for reasons of simplicity.

the road fence and onto a trailer. When not in use, the gate would be locked, thereby preventing others from entering the land without Sullivan's permission. Of further note is evidence indicating that this gate was also the sole means available to Sullivan of accessing section 29. In addition to operating his cattle business, Sullivan also engaged in recreational activities (such as hunting) on both section 29 and the disputed parcel abutting it. Moreover, his successors in interest (including Ganss) continued the practices he started once they acquired it. They placed cattle and engaged in recreational activities upon both tracts. They, like Sullivan, also repaired the road fence when such repairs were needed.

Unlike Sullivan, Smith did not place structures upon the northern part of the disputed land abutting section 30. He did utilize the parcel, however, by allowing cattle to graze upon it on a seasonal basis. So too did he and other family members ride horses and/or motorcycles upon both tracts, hunt on them, and use them as a means of accessing section 30 in general via a second gate built into the road fence north of the dividing fence. As did Sullivan, Smith also repaired the road fence when needed.

Again, the disputed parcel was actually within the boundaries of sections 26 and 27, rather than 29 and 30. Furthermore, neither Smith nor Sullivan (or his successors) owned recorded interests in sections 26 or 27. In 1968, those sections were owned by a different family named Smith, who apparently conducted a farming operation on the lands. They were then conveyed to a family named Mitschke, who continued the operation. The Mitschkes eventually conveyed the two sections to Riddle in 2014.

Despite the fact that the disputed parcels were part of sections 26 and 27, we have been cited to no evidence indicating that any of their owners ever utilized the 17-acre bulge. Nor have we been cited to evidence that they ever attempted to 1) access it without

4

permission from Smith or Sullivan or 2) repair the road fence. Additionally, it was not until some 30 years after Smith bought section 30 that anyone holding the record title to the bulge verbally informed Smith of his or her interest in it. That occurred when a Mitschke family member saw Smith on the disputed parcel and mentioned that the land belonged to the Mitschkes. Smith responded by informing the person that he had not heard that before. Nothing else was said of the matter until Riddle bought the land. Controversy over ownership then arose resulting in Riddle driving heavy equipment through the road fence.

Again, Smith and Ganss sued to establish title to the property via adverse possession. The trial court ruled in favor of them and issued findings of fact and conclusions of law supporting its decision. Riddle attacks the sufficiency of the evidence underlying that ruling and those findings through three issues.

*Authority and Its Application*

We review the trial court's findings under the same standards used in assessing the legal and factual sufficiency of a jury's verdict. *In re Estate of Riefler*, 540 S.W.3d 626, 635 (Tex. App.—Amarillo 2017, no pet.). The legal and factual sufficiency of the evidence underlying a jury's verdict is reviewed under the standards we described in *Hrncirik v. Hrncirik*, No. 07-15-00001-CV, 2016 Tex. App. LEXIS 9661, at *8–9 (Tex. App.—Amarillo Aug. 30, 2016, no pet.) (mem. op.).

Next, the doctrine of adverse possession is little more than the application of a statute of limitations. *See Wells v. Johnson*, 443 S.W.3d 479, 488 (Tex. App.—Amarillo 2014, pet. denied). The statute applicable here is § 16.026 of the Texas Civil Practice and Remedies Code. It states that a "person must bring suit not later than 10 years after the day the cause of action accrues to recover real property held in peaceable and

5

adverse possession by another who cultivates, uses, or enjoys the property." TEX. CIV. PRAC. & REM. CODE ANN. § 16.026(a) (West 2002). Our legislature defined adverse possession as "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." *Id.* § 16.021(1). Satisfying this definition normally requires proof of six elements. They consist of 1) visible appropriation and possession of the disputed property, 2) that is open and notorious, 3) that is peaceable, 4) that is made under a claim of right, 5) that is adverse and hostile to the claim of the owner, and 6) that is consistent and continuous for the duration of the statutory period. *Wells*, 443 S.W.3d at 489. In other words, the evidence must show possession was actual, visible, continuous, notorious, distinct, hostile, and of such a character as to illustrate an unmistakable assertion of ownership by the occupant. *Tunnell v. Gary W. Compton & Loretta Compton Trust*, No. 07-16-00406-CV, 2018 Tex. App. LEXIS 3940, at *7–8 (Tex. App.—Amarillo May 31, 2018, no pet. h.) (mem. op.).

*Issues One and Two–Establishing Adverse Possession*

Though divided into two issues, both tend to address whether the evidence established that Smith and Ganss adversely possessed the disputed parcel. We begin with the claim of Smith.

Smith's ties to the land were longstanding, given the time spent there while young while visiting his grandparents and relatives. Furthermore, the disputed parcel was utilized for recreational and animal husbandry purposes long before he acquired it, and he continued those practices. Nonetheless, few if any man-made structures appeared on the disputed parcel north of the dividing fence. And, though evidence indicates that Smith and his predecessors would repair the fence from time to time, nothing indicates

6

that there were any major or distinguishing alterations to that structure since it was erected. Nor did he or anyone else know who built the fence or why the fence was originally built.

Fencing of land may be considered as visible appropriation of the enclosed property. *Wells*, 443 S.W.3d at 489–90. But, the law recognizes that merely grazing of land incidentally enclosed by a fence erected by others does not support adverse possession. *Harlow v. Giles*, 132 S.W.3d 641, 647 (Tex. App.—Eastland 2004, pet. denied); *accord Wells*, 443 S.W.3d at 489 (stating that, though fencing of land is recognized as visible appropriation of the property enclosed, grazing and related uses of the property are insufficient to establish adverse possession where the disputed land was incidentally enclosed by a casual fence). The latter rule applies to casual fences, that is, fences existing on the land before the occupant gained possession and built for unknown purposes. *Harlow*, 132 S.W.3d at 647. Moreover, repairing or maintaining the fence, even for the express purpose of maintaining livestock, does not change its status as casual. *Id.* To lose that moniker, the fence must undergo substantial modification. *Wells*, 443 S.W.3d at 490. As previously mentioned, Smith did not erect the fence separating the disputed parcel from CR 103. It was there when he acquired section 30. Nor did he know who built it or why it was built as it was. So, the fence was nothing short of casual. Its presence coupled with its occasional repair, the seasonal grazing conducted upon the rather small portion of the disputed parcel adjacent to section 30, the occasional sporting activities also conducted on it did not establish adverse possession. This is especially so when access to the disputed parcel remained available to anyone, including the record owner, by choosing to simply open the gate and walk in; unlike Sullivan, McDuff, Shelton, and Ganss, Smith did not lock the gate.

7

The outcome differs little even if one were to consider the evidence that Smith included the disputed land in an application for assistance through a farm/ranch program. There is no evidence that the record owner, or public in general, knew of this. And, it occurred only once in the 1980s. This instance also contrasts with other instances wherein Smith obtained loans, offered section 30 as security, and repeatedly omitted the disputed parcel north of the dividing fence from the offer.

Also missing is evidence indicating that Smith endeavored to exclude any of the owners of sections 26 and 27 from the disputed property. While it was bordered by the road fence, it contained an unlocked gate. And, instead of informing Mitschke that the land was his when that owner broached the matter, he simply declared his lack of knowledge about that matter. When Riddle later broached the topic, Smith offered to either buy or lease the property in question from the record owner; he did not claim ownership.

As we recognized in *Wells*, "[w]hile the fencing of land has long been recognized as visible appropriation of the property enclosed . . . use of the land for grazing cattle, along with other related uses, is insufficient to establish title by adverse possession where the disputed land was incidentally enclosed by a casual fence." *Id.* at 489. The evidence upon which Smith staked his claim to adverse possession consisted of little more than that quoted above. He paid no taxes on the property at issue. He did not include it within the scope of land tendered as collateral for loans. He did not include it in either his homestead or non-homestead designation. He simply allowed cattle to graze upon it occasionally, occasionally conducted recreational activity upon it, and occasionally mended the surrounding fence. What we said in *Wells* controls the outcome here. The

8

evidence did not establish adverse possession. So, the trial court's findings to the contrary lack legally sufficient evidentiary support.

As for the Ganss claim to adverse possession, the question is easily resolved by reference to a long-ago edict from the Texas Supreme Court. The opinion to which we refer is *Southern Pine Lumber Co. v. Hart*, 161 Tex. 357, 340 S.W.2d 775 (1960), and it too concerned the doctrine of adverse possession, among other theories. Apparently, Hart sought to claim ownership of about 900 acres when his deed conveyed only 700 to him. In rejecting his claim, the Supreme Court reiterated: "'[it] is a well settled rule that when one enters into possession of land under a deed, his possession is referable to the deed, and it is presumed to be in conformity with it, ***and is confined to the limits thereof***.'" *Id.* at 363–64, 340 S.W.2d at 780–81 (quoting *Harmon v. Overton Ref. Co.*, 130 Tex. 365, 109 S.W.2d 457 (1937)) (emphasis added); *see Moore v. Stone*, 255 S.W.3d 284, 291 (Tex. App.—Waco 2008, pet. denied) (stating the same). Ganss assumed ownership of section 29 via a deed describing the land by metes and bounds, which description omitted the disputed land. Thus, the land he owned and lawfully possessed was referable to the deed and, ergo, confined to the metes and bounds demarcating property only within section 29. It did not include any of Riddle's section 27. So, even if we were to assume that his predecessors engaged in activities sufficient to evince adverse possession, his title did not include whatever interest in the property they may have acquired. *See Loeffler v. Lytle Indep. Sch. Dist.*, 211 S.W.3d 331, 343 (Tex. App.—San Antonio 2006, pet. denied) (stating that where title has matured by limitation, tacking no longer applies and title so matured can only be conveyed by a written instrument). Moreover, Ganss' ***own*** use of the disputed land was not for a time period long enough to satisfy the 10-year limitations statute, as acknowledged at trial. *See*

9

*Moore*, 255 S.W.3d at 291 (stating that "[t]o claim adjoining land outside the limits of the described boundaries, the possessor must have actual possession of such additional land of such a character as of itself will give notice of an actual adverse possession").

In sum, we reverse the judgment and enter judgment denying Smith and Ganss both recovery against Riddle and an ownership interest in the disputed parcel. We remand to the trial court the issue of attorney's fees, if any, recoverable by Riddle.[3]


Brian Quinn
Chief Justice

---

[3] Riddle prayed for attorney's fees under § 16.034(a)(1) and (2) of the Texas Civil Practice and Remedies Code. The statute provides that:

> In a suit for the possession of real property between a person claiming under record title to the property and one claiming by adverse possession, if the prevailing party recovers possession of the property from a person unlawfully in actual possession, the court:
>
> (1) ***shall*** award costs and reasonable attorney's fees to the prevailing party if the court finds that the person unlawfully in actual possession made a claim of adverse possession that was groundless and made in bad faith; and
>
> (2) ***may*** award costs and reasonable attorney's fees to the prevailing party in the absence of a finding described by Subdivision (1).

TEX. CIV. PRAC. & REM. CODE ANN. § 16.034(a) (West Supp. 2017) (emphasis added). Such fees are mandatory if the party claiming under record title prevails and the trial court determines that his opponent's claim of adverse possession was both groundless and in bad faith. *See Nac Tex Hotel Co. v. Greak*, 481 S.W.3d 327, 335 (Tex. App.—Tyler 2015, no pet.) (holding that because the trial court did not find bad faith, an award of attorney's fees was not required). If the claim is not groundless and in bad faith, whether to award of fees lies within the trial court's discretion. *Id.*

10